590 F.2d 1085
 191 U.S.App.D.C. 383, Fed. Sec. L. Rep. P 96,553
 BRADFORD NATIONAL CLEARING CORPORATION and Bradford
Securities Processing Services, Inc., Petitioners,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent, New York
Stock Exchange, Inc., et al., National Securities
Clearing Corporation, Intervenors.
BRADFORD NATIONAL CLEARING CORPORATION and Bradford
Securities Processing Services, Inc., Petitioners,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent, National
Securities Clearing Corporation, Intervenor.
 Nos. 77-1199, 77-1547.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 12, 1978.
Decided Sept. 19, 1978.
 
 Syllabus by the Court
 Section 17A of the Securities Exchange Act, 15 U.S.C. § 78q-1, as amended by the Securities Act Amendments of 1975 (1975 Amendments), Pub.L. 94-29, 89 Stat. 141, gives the Securities and Exchange Commission (SEC) authority to facilitate the establishment of a national system of clearing securities. Pursuant to its authority under this provision as well as under section 19 of the Securities Exchange Act, 15 U.S.C. § 78s, also as amended by the 1975 Amendments, the SEC approved the application of National Securities Clearing Corporation (NSCC) for registration as a clearing agency, Securities Exchange Act Release No. 13,163 (Jan. 13, 1977), and the SEC subsequently approved two rule changes proposed by NSCC, Securities Exchange Act Release No. 13,456 (Apr. 21, 1977). Held : The registration of NSCC, challenged in No. 77-1199, is upheld except insofar as the SEC approved NSCC's use of "geographic price mutualization" and NSCC's mode of allocating its facilities management contract, which matters are remanded to the SEC for further consideration. The SEC's approval of the rule changes, challenged in No. 77-1547, is sustained.
 (1) Partially as a result of the inability of clearing facilities in the late 1960's to keep pace with the rising trading volume, Congress in the early 1970's undertook a "searching reexamination" of the securities industry and resolved by way of the 1975 Amendments to give the SEC broad powers to restructure that industry. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1090-1096 of 590 F.2d.
 (a) Congress gave the SEC the responsibility, and various quasi-legislative powers, including the power to register clearing agencies, to facilitate the rapid establishment of a safe, efficient, and computerized national clearing system. Pp. ---- - ---- of --- U.S.App.D.C., pp. 1091-1094 of 590 F.2d.
 (b) Congress gave the SEC similar responsibility and authority to facilitate the establishment of a national market system. P. ---- of 191 U.S.App.D.C., 1094 of 590 F.2d.
 (c) Congress intended to give the SEC exceptionally broad powers to determine the precise structure of both the national clearing and national market systems, but it placed slightly more emphasis on rapid development and national availability with respect to the former system, and on competition with respect to the latter. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1095-1096 of 590 F.2d.
 (2) NSCC's registration application (pp. ---- - ---- of 191 U.S.App.D.C., pp. 1096-1099 of 590 F.2d), as amended by four SEC-imposed conditions (pp. ---- - ---- of 191 U.S.App.D.C., pp. 1099-1101 of 590 F.2d), was properly granted by the SEC, except in two respects. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1103-1114 of 590 F.2d.
 (a) The SEC's procedures in granting the application were not challenged and were sufficient. P. ---- of 191 U.S.App.D.C., p. 1099 of 590 F.2d.
 (b) The recent SEC hearings on NSCC are part of its ongoing oversight responsibilities and do not indicate any disapproval of its former registration decision. There is consequently no cause to remand the case to the SEC on this basis. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1102-1103 of 590 F.2d.
 (c) The SEC's interpretation of the 1975 Amendments is entitled to some respect, because it is contemporaneous with passage of the legislation and is reasoned. Although reviewed under a "substantial evidence" test, the SEC's exercise of delegated authority deserves even greater deference because of the predictive and legislative nature of the facts with which it is dealing, the informal nature of the record from whence those facts are derived, and the extremely broad range of choice given it by Congress. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1103-1105 of 590 F.2d.
 (d) The SEC correctly interpreted the statute to require it to balance the anticompetitive impact of registration against the aggregate of the possible regulatory benefits of registration and the likelihood that those benefits will actually accompany registration. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1104-1106 of 590 F.2d.
 (e) In general, the SEC properly balanced the relevant factors in concluding that its four conditions to registration, its ongoing oversight, and its willingness to modify or withdraw registration in the future will prevent the anticompetitive effects of registration from outweighing the beneficial impact thereof on the rapid development of a safe and efficient national clearing system. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1106-1111 of 590 F.2d.
 (f) The SEC's explanation for allowing NSCC to practice "geographic price mutualization" (GPM) appears inconsistent with its discussion of the competitive potential of registering NSCC, and the case must be remanded for reconsideration of the propriety of including GPM in the approval application. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1111-1113 of 590 F.2d.
 (g) The SEC improperly failed to consider the anticompetitive effects of NSCC's decision not to subject its facilities management contract to competitive bidding, and the case must be remanded for consideration of the propriety of approving NSCC's application in light of that decision. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1113-1114 of 590 F.2d.
 (3) The proposed rule changes (pp. ---- - ---- of 191 U.S.App.D.C., pp. 1101-1103 of 590 F.2d) were properly approved by the SEC. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1114-1116 of 590 F.2d.
 (a) The SEC balanced the relevant factors in arriving at its decision to approve the rule changes. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1115-1116 of 590 F.2d.
 (b) Approval of interim rule changes prior to NSCC's satisfaction of the four conditions is consistent with the SEC's registration order, insofar as the changes, as here, are (1) consistent with the requirements of the 1975 Amendments, and (2) do not allow NSCC substantially to change its rules and thus to cement its monopoly position. Pp. ---- - ---- of 191 U.S.App.D.C., pp. 1115-1116 of 590 F.2d.
 Petitions for Review of Orders of the Securities and Exchange Commission.
 Taylor R. Briggs, New York City, with whom Douglas W. Hawes and Richard C. Cole, New York City, were on brief, for petitioners in No. 77-1199.
 Morris N. Simkin, New York City, for petitioners in No. 77-1547.
 Jacob H. Stillman, Principal Asst. Gen. Counsel, Securities and Exchange Com'n, Washington, D. C., with whom Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel, and Angela M. Desmond and Linda W. Jarett, Attys., Securities and Exchange Commission, Washington, D. C., were on brief, for respondent in Nos. 77-1199 and 77-1547.
 Edwin B. Mishkin, New York City, with whom Robert T. Greig and Robert J. Woldow, New York City, were on brief, for intervenor, National Securities Clearing Corp. in Nos. 77-1199 and 77-1547.
 Edward J. Reilly, Thomas A. Williams and Kenneth A. Perko, Jr., New York City, were on brief, for intervenors, New York Stock Exchange, Inc., et al. in No. 77-1199.
 John M. Liftin, George C. Smith and Barbara Black, Washington, D. C., were on brief, for amicus curiae in No. 77-1199 urging affirmance.
 Before McGOWAN and WILKEY, Circuit Judges, and DAVIS* Judge, United States Court of Claims.
 Opinion for the Court filed by McGOWAN, Circuit Judge.
 McGOWAN, Circuit Judge.
 
 
 1
 These two unconsolidated direct review proceedings involve challenges by subsidiaries of Bradford National Clearing Corporation to successive orders of the Securities and Exchange Commission (SEC or the Commission). In No. 77-1199, petitioners ask this court to set aside the Commission's conditional approval of the application of intervenor National Securities Clearing Corporation (NSCC) for registration as a clearing agency pursuant to section 17A(b) of the Securities Exchange Act, 15 U.S.C. § 78q-1(b). In re The Application of Nat'l Securities Clearing Corp. for Registration as a Clearing Agency (hereinafter Order I ), SEC Securities Exchange Act Release No. 13,163 (Jan. 13, 1977), 42 Fed.Reg. 3916 (1977). No. 77-1547 seeks reversal of a subsequent SEC order under section 19(b) of the Securities Exchange Act, 15 U.S.C. § 78s(b), allowing NSCC to adopt two self-regulatory rules that are purportedly aimed at meeting the conditions set by the Commission in approving NSCC's registration as a clearing agency. In re Nat'l Securities Clearing Corp. (hereinafter Order II ), SEC Securities Exchange Act Release No. 13,456 (Apr. 21, 1977), 42 Fed.Reg. 21881 (1977).
 
 
 2
 In light of the significant overlap in the issues involved in the two petitions, we have decided to treat both in the same opinion. The order involved in No. 77-1199 is affirmed, except insofar as the Commission approved NSCC's use of "geographic price mutualization" and its mode of allocating its facilities management contract. As to those issues the case is remanded to the SEC for further consideration. The order under review in No. 77-1547 is affirmed.
 
 
 3
 * Much of the historical and statutory background for this suit is laid out in considerable detail in Order I.[1] From 1934 to the present, the Commission has exercised regulatory jurisdiction over transactions in major securities markets under the Securities Exchange Act of 1934 (hereinafter 1934 Act), 15 U.S.C. § 78a Et seq. For most of that period, the SEC's attention was directed to the registration and oversight of the major classes of participants in those markets, and particularly to the prevention of certain manipulative and abusive practices. In carrying out these duties, the SEC took the securities markets essentially as it found them, and attempted to establish and preserve a high degree of openness and fairness. See generally section 2 of the 1934 Act, 15 U.S.C. § 78b.
 
 
 4
 In the 1960's and early 1970's, however, more attention began to be paid to the possibility of changing the overall structure of the securities industry in order to make it more competitive, national, and efficient. Of particular relevance in this suit, the late 1960's saw the breakdown of the efficient functioning of brokers' "back offices" I. e., of the segment of the industry that effectuates trades after they are initially negotiated on an exchange or in the over-the-counter market.[2] As a result of this "paperwork crisis," many purchasers never actually received their stock certificates nor sellers their money. Moreover, a goodly number of brokers, faced with liability for these incomplete transactions, went bankrupt.
 
 
 5
 In response to these "operational breakdowns and economic distortions," Congress and the Commission undertook "the most searching reexamination of the competitive, statutory, and economic issues facing the securities markets, the securities industry, and . . . public investors, since the 1930's." House Comm. of Conference, Conference Report on the Securities Acts Amendments of 1975, H.Rep.No.229, 94th Cong., 1st Sess. 91 (1975), U.S.Code Cong. & Admin.News 1975, pp. 179, 322 (hereinafter referred to as Conf.Rep.). The outgrowth of these investigations, See note 1 Supra, was the Securities Acts Amendments of 1975 (1975 Amendments), Pub.L. 94-29, 89 Stat. 141 (1975). With this legislation, the SEC's regulatory authority under the 1934 Act was expanded to enable it to effect major changes in the method of handling securities transactions.
 
 
 6
 Two such changes bear directly on the issues raised by the petitions. Most critically, in terms of these petitions, Congress recognized the need for a "(n)ational system for clearance and settlement of securities transactions," the objective of which is to interconnect all American clearing agencies and place them under uniform rules, so that together they can provide prompt, safe, and efficient clearance facilities that take full advantage of modern data processing and communications technology. Section 17A(a)(1) of the 1934 Act, 15 U.S.C. § 78q-1(a)(1). The 1975 Amendments direct the Commission to "facilitate the establishment" of this national system "in accordance with" the objective paraphrased above and "having due regard for" several other concerns, including the "maintenance of fair competition among brokers and dealers, clearing agencies, and transfer agents." Id. § 17A(a)(2), 15 U.S.C. § 78q-1(a)(2).[3]
 
 
 7
 To carry out this broad directive, Congress gave the SEC authority to register clearing agencies that meet certain specified criteria, including an ability to clear and settle securities transactions promptly and accurately and an absence of rules that impose "any burden on competition not necessary or appropriate in furtherance of the purposes" of the 1934 Act. Without such registration, or an SEC exemption therefrom, it is illegal to operate such an agency. Id. § 17A(b), 15 U.S.C. § 78q-1(b).[4]
 
 
 8
 That Congress conceived of the registration process as a means toward the end of a Commission-generated national clearing system is apparent from that process.[5] Rather than mandating an adjudicatory procedure, as might be expected of an administrative mechanism aimed at conferring a government license, Congress made the process distinctly legislative in nature. After the application is filed, the agency must publish it and receive public comments thereon. The Commission may then grant registration, or institute proceedings to determine whether the application should be denied. Id. § 19(a), 15 U.S.C. § 78s(a).[6] The quasi-legislative nature of registration decisions is further indicated by congressional references to the informal rulemaking provision in the Administrative Procedure Act and to the need to preserve the SEC's rulemaking authority in the clearing area,[7] and by the fact that judicial review of the SEC's decision, while controlled by the "substantial evidence" rule in its factual aspects, is otherwise left unspecified, and, therefore, is apparently limited to review for arbitrariness, caprice, and abuse of discretion. Id. § 25(a)(4), 15 U.S.C. § 78y(a)(4). See generally Industrial Union Dep't v. Hodgson, 162 U.S.App.D.C. 331, 499 F.2d 467 (1974).
 
 
 9
 Congress further cemented the SEC's control over the shape of the clearing industry by requiring its approval of any new or modified rules adopted by a clearing agency. A similarly quasi-legislative procedure is established for the Commission's consideration of such rules, and its decision is judicially reviewable under the same provision governing review of its registration decisions. Id. §§ 19(b), 25(a)(4), 15 U.S.C. §§ 78s(b), 78y(a)(4).[8]
 
 
 10
 The second major accomplishment of the 1975 Amendments, as relevant here, is the granting of responsibility to the SEC to facilitate the establishment of a "(n)ational market system for securities." Id. § 11A, 15 U.S.C. § 78k-1. The goal of this system is to use modern communication and data processing equipment to link all securities markets nationwide, so that (i) information is equally available, and securities transactions may be completed equally cheaply and easily, anywhere in the nation, and (ii) "fair competition" may exist between all investors, brokers, dealers, and securities markets, no matter where they are located. Id. § 11A(a)(1), 15 U.S.C. § 78k-1(a)(1). Once again the Commission is "directed" to carry out this objective, and is given several types of authority toward that end, including the authority and responsibility to register and regulate "securities information processors." Id. §§ 11A(a)(2), (b), (c), 15 U.S.C. §§ 78k-1(a)(2), (b), (c).[9]
 
 
 11
 The drafters of the 1975 Amendments assumed that the national market and national clearing systems would reinforce each other. See House Comm. on Interstate and Foreign Commerce, Securities Reform Act of 1975, H.Rep.No.123, 94th Cong., 1st Sess. 44, 51 (1975) (hereinafter referred to as H.Rep.). Together, they would allow an investor anywhere in the United States to initiate and then complete a securities transaction with the aid solely of a local broker of his choice, dealing on a regional exchange and clearing through a regional agency also of his choosing, and having available throughout the process the most complete and up-to-date national information possible. See S.Rep., Supra note 1, at 7. See also Section 2, 15 U.S.C. § 78b. Moreover, as to both of the projected systems Congress self-consciously refused to determine "the merits of any particular system." S.Rep., Supra note 1, at 5, U.S.Code Cong. & Admin.News 1975, p. 184. Instead, it hoped that the impetus for both would come from the private sector and it provided the Commission with "intentionally broad" and "clear power" and "discretion" to shape the developing systems.[10] As to both systems, the Commission's primary directive from Congress was to be "bold and effective" and to act quickly. Id. at 55.
 
 
 12
 Despite their interdependence and their common subjection to broad SEC authority, the national market and clearing systems were not perceived by Congress as identical pillars supporting the legislators' conception of a modernized approach to securities marketing. Most importantly, Congress' directives to the Commission with respect to the two systems vary slightly but significantly. Although in facilitating the establishment of both systems, the SEC is required to adhere to "the findings and to carry out the objectives set forth" in the first subsection of each of the two relevant provisions, those findings and objectives are not entirely parallel. Sections 11A(a), 17A(a), 15 U.S.C. §§ 78k-1(a), 78q-1(a); See notes 3 & 9 supra. Thus, while both lists of objectives include the full exploitation of technological advances in communication and data processing equipment, efficiency, and the linkage of all relevant facilities nationally, only the national market system objectives include the "enhance(ment)" of "fair competition among brokers and . . . exchange markets . . . "[11] and only the national clearing system objectives include promptness and the development of uniform standards and procedures. Id. § 11A(a)(1), 17A(a)(1), 15 U.S.C. §§ 78k-1(a)(1), 78q-1(a)(1).[12]
 
 II
 A.
 
 13
 At the time of the passage of the 1975 Amendments, a separate clearing agency owned by each of the national and regional stock exchanges, and one owned by the National Association of Securities Dealers (NASD) which operates the over-the-counter (hereinafter "OTC") market performed all of the clearing services for transactions initiated on the exchange or in the market with which it was affiliated.[13] Recently, petitioner Bradford National Clearing Corp. (BNCC) has made inroads into the clearing industry by competitively bidding on and winning two facilities management contracts under which it operates the clearing agencies owned by the Pacific Stock Exchange one of the regional exchanges and by NASD.[14]
 
 
 14
 In the past, the rigid division of the clearing market along the lines of the various trading markets virtually precluded any competition between clearing agencies. This division stemmed in large part from rules promulgated by each of the exchanges and by NASD that required brokers trading in that market to utilize only the clearing agency affiliated therewith.
 
 
 15
 Even before the 1975 Amendments passed, Congress, representatives of various exchanges, NASD, and independent associations of brokers and dealers had begun exploring the possibility of dramatically centralizing the clearing facilities in this country. The initial efforts in this discretion began in earnest in the fall of 1973 and contemplated the merger of several existing clearing agencies, including those owned by NYSE, AMEX, NASD, and most of the regional exchanges. The impetus for merger came from the expectation that by the elimination of duplicative services and facilities the clearing industry would reduce costs and avoid a recurrence of the "paperwork crisis." The negotiators particularly those representing brokers and dealers apparently concentrated on finding a way to combine the three clearing agencies (NYSE's SCC, AMEX's ASECC, and NASD's NCC (hereinafter, "the New York clearing agencies") then operating virtually identical facilities located within a few blocks of each other in downtown New York.[15]
 
 
 16
 Actually, NYSE and AMEX had already pioneered the merger approach by jointly establishing the Securities Industry Automation Corp. (SIAC), and by contracting with SIAC to operate the two clearing corporations (SCC and ASECC) affiliated with the two parent exchanges. Nevertheless, the NYSE-AMEX "merger" was not complete because SIAC continued to operate the two clearing corporations separately, and the exchanges continued to enforce their rules that tied each of their trading facilities to their clearing facilities. The 1973-74 merger negotiations seem to have contemplated an expansion of SIAC not only to take over the operation of all of the merged clearing agencies, but also to integrate them fully. Nonetheless, these negotiations proved unsuccessful and were discontinued in mid-1974.
 
 
 17
 Soon after passage of the 1975 Amendments, NYSE, AMEX, NASD, and committees made up of their member-brokers renewed their efforts to negotiate a merger of the New York clearing agencies. These efforts came to fruition on July 15, 1975 when representatives of NYSE, AMEX, and NASD signed an agreement in principle to establish a jointly owned entity to which would be transferred the operations of the three New York clearing corporations. The agreement further provided for participant control of the new entity by way of a board of directors composed in the main of brokers and dealers,[16] although its structure and rules would be designed to "avoid any loss (of revenues) to the respective parent companies (NYSE, AMEX, NASD)."[17]
 
 
 18
 In addition, the agreement in principle specified that SIAC would act as facilities manager and processor for the new entity. The parties included this last provision in their agreement despite the fact that during these latest negotiations BNCC offered to bid competitively against SIAC for the management-processing contract with the new entity. The parties to the agreement informed BNCC that its offer was premature, because negotiations were still going on, and they refused to honor BNCC's request for information on which to base its bid. In the negotiators' eyes, however, the time for BNCC's proposal apparently never matured, as they accepted SIAC as the manager-processor without further exploration of BNCC's counter proposal.[18]
 
 
 19
 Final negotiations continued throughout 1975 and into 1976, leading in March of that year to the incorporation of the National Securities Clearing Corp. (NSCC), the entity into which the three New York clearing organizations were to be merged, and to the filing with the Commission of NSCC's application for registration as a clearing agency under sections 17A(b), 19(a)(1), 15 U.S.C. §§ 78q-1(b), 78s(a)(1). See notes 4-5 Supra.
 
 
 20
 In summary, NSCC's application contemplated that the merger would be accomplished in two phases. During Phase I, projected to last approximately four months,[19] NSCC, through SIAC,[20] would operate the three merged New York clearing agencies as separate divisions, and the rules tying each of the two parent exchanges and NASD's over-the-counter market to one of those divisions would be retained.
 
 
 21
 In Phase II, NSCC would convert the three New York clearing operations into a single system capable of providing its participants with all of the services that previously were provided by at least one of the New York clearing agencies. At this point, of course, the rules tying trading markets to clearing agencies, if still intact, But see note 25 Infra, would become obsolete. Moreover, NSCC's plan called for its services to be made available not only to the current participants in the three New York clearing agencies but also to certain other (financially responsible and otherwise qualified) entities.
 
 
 22
 Nonetheless, even during Phase II, NSCC proposed to restrict its "comparison" services, See note 2 Supra, and thus the possibility of "one-shot" clearing and settlement, to (1) its participants located in New York who submit NYSE, AMEX, or OTC transactions for comparison, (2) its participants located outside of New York insofar as (a) they act through the regional network formerly operated by NCC, See note 15 Supra, and (b) the transactions submitted for comparison occurred over the counter. Only later would it compare NYSE and AMEX transactions through its regional offices. Hence, its restrictions on comparison facilities even in Phase II assured that only NYSE, AMEX, and OTC traders in New York, OTC traders outside of New York, and eventually NYSE and AMEX traders outside of New York would have direct access to its one-shot comparison, clearing, and settlement services.[21] As in Phase I, a nonparticipant in NSCC, even if trading NYSE, AMEX, or OTC securities and even if trading with an NSCC participant, would not have access to NSCC's comparison facilities. Nor, of course, would anyone participant or nonparticipant in NSCC have such access if the trade took place on a regional exchange.
 
 
 23
 In both phases, NSCC proposed to base its fees to participants on the total cost of providing its services. See also note 17 Supra. The fees charged individual participants in a transaction, however, would not necessarily reflect the cost of that transaction. Instead, the merged entity would design its fee structure so that participants in New York and those outside of New York who utilized the regional network formerly operated by NCC, See note 15 Supra, would pay the same clearing fees, even though, as was likely, at least in the early stages, the New York transactions cost less. This pricing scheme, "geographic price mutualization," was designed to allow greater "competition" between brokers in and outside of New York.[22]
 
 
 24
 As required by statute, the SEC made NSCC's proposal the subject of public notice, and received comments thereon from various parties.[23] In addition, the full Commission held informal hearings at which twenty-three organizations were represented. The SEC explicitly expanded the time and fora available for public comment as well as the substantive scope thereof beyond that required by the statute and traditionally afforded by the agency for registration applications. It did so in recognition of the "likely . . . determinative impact" this particular application would have on its accomplishment of its duty to facilitate the establishment of a national clearing system. See note 5 Supra.
 
 
 25
 In general, NSCC registration was supported by brokers and dealers whether located in New York or elsewhere. Opposing registration were the regional exchanges and their affiliated clearing agencies, as well as petitioners and the Antitrust Division of the Justice Department (hereinafter, the Justice Department). In November 1976, the Commission again issued a public notice soliciting comments this time concerning its tentative decision to approve registration contingent upon NSCC's meeting four conditions designed to ameliorate the anticompetitive effects that NSCC's opponents feared. Although most commentators reiterated their earlier positions, the opposition to registration softened somewhat, and on January 13, 1977, the Commission, in a lengthy order, granted NSCC registration with four conditions.
 
 
 26
 Under Condition 1, NSCC must, before Phase II begins, establish "full interfaces" or "appropriate links" with several specified clearing agencies most particularly, those affiliated with the regional exchanges, including one operated by petitioner BNCC.[24] Other clearing agencies, including petitioners herein, have been offered the right to like interfaces as soon as they have the capability of offering minimally adequate clearing services.[25] NSCC must offer these interfaces without any charges amounting to a fee for moving data through an interface. Consequently, all users of NSCC will help fund its establishment and maintenance of the interfaces.[26]
 
 
 27
 Condition 2 requires NSCC, before inaugurating Phase II, to provide at cost facilities to which other clearing agencies as well as its own branch offices may forward trade data for comparison. See note 21 Supra. Together, Conditions 1 and 2 assure that any clearing agency in which a broker chooses to participate either (1) may clear and settle that broker's transaction after the parties to it have compared their trade themselves through NSCC, or (2) may itself submit the broker's data to NSCC for comparison, and then complete the clearing and settlement functions. In either case, the agency may represent any broker no matter what clearing agency serves the broker or the other side of the transaction, what kind of security is traded, and what market or exchange is involved.
 
 
 28
 Under Condition 3, NSCC must share with any competing clearing agency that comes forward the operation (and expenses) of the regional branches that NCC has operated in the past. See note 15 Supra. By this mechanism, a regional clearing agency located in one city might find it easier to compete with NSCC in other cities as well.
 
 
 29
 Finally, Condition 4 attempts to fill the void created by NSCC's refusal to compare OTC trades between nonparticipants and between a participant and a nonparticipant. Under this requirement, NSCC (1) must, without charge, share its computer program technology with any clearing agency that proposes to compare OTC transactions between that agency's participants, and it (2) must convince some other clearing agency, or must itself offer, to compare OTC transactions between participants in different clearing agencies.
 
 
 30
 The upshot of the four conditions plus NSCC's proposal is that, for purposes of comparing NYSE and AMEX transactions, NSCC is essentially a public utility that is afforded a monopoly but must offer its services to all qualified customers (its own participants or other clearing agencies) at cost. NSCC (or some other clearing agency, if one comes forward) must also serve this utility function for purposes of making OTC comparisons for participants in different clearing agencies. By contrast, as to the remaining clearing functions, NSCC is perceived by the Commission as in competition with all other agencies offering like services. Given NSCC's geographic monopoly in New York as well as its established set of regional branches, however, the Commission realized that NSCC would be "likely to achieve a dominant position" as to All "securities processing" functions. Release No. 12,489, Supra note 5, at 2. Consequently, in order partially to blunt that competitive edge, the SEC insisted that NSCC allow full interfaces with other qualified clearing agencies so that they can clear and settle any of their customers' transactions even if an NSCC participant is on the other side of the trade. It also encouraged other agencies to expand their portion of the market at NSCC's expense by requiring the latter to share with them its computer program technology and its branch office facilities.
 
 B.
 
 31
 Several months after securing registration, NSCC once again approached the Commission concerning actions it desired to take in the clearing field. In this case, NSCC desired to initiate two new rules that it portrayed as necessary to aid it in achieving the conditions imposed on its registration by the SEC, and thus to move a couple of steps closer to Phase II. It sought the SEC's approval under section 19(b)(1), 15 U.S.C. § 78s(b)(1). See note 8 Supra. Here again, the Commission accepted public comments on the rules, and it made them the subject of a meeting before some of the Commissioners. Securities Exchange Act Release Nos. 13,308, 13,318 (Feb. 28, 1977). On the same day as the meeting, the Commission issued an order approving the proposed rules with minor modifications. Order II.
 
 
 32
 The first rule, the "Bond Rule," allowed NSCC, during Phase I, to transfer the clearing function for bonds traded on AMEX from its ASECC to its SCC division. In other words, it made its division that formerly was the sole clearing facility for all securities traded on the NYSE the sole clearing facility, in addition, for all debt securities traded on the AMEX. It argued that a further consolidation of services and data processing facilities in the SCC division, which already operates the limited RIO interfaces, See note 26 Supra, would enable it more easily to establish the full interfaces with other clearing agencies as required by Condition 1 in Order I.[27]
 
 
 33
 The second rule, the "Special Representative Rule," is much more complicated, but essentially takes some additional tentative steps in the direction of fully interfacing NSCC with other clearing agencies and of streamlining its own operations. In part, the rule expands the number of brokers and securities that are allowed access to the experimental interface program (RIO) begun in 1975 by SCC and several of the regional clearing agencies. See note 26 Supra. As a result, more nonparticipants in NSCC can use the regional clearing agency in which they do participate to clear NYSE and AMEX transactions, and they can do so even if they do not participate in the same clearing agency as the brokers on the other side of their trades.[28]
 
 
 34
 After each of the two SEC orders at issue here was issued by the Commission, petitioners brought separate direct actions for review. This court set both petitions down for argument on the same day before the same panel, in light of their related nature. Bradford Nat'l Clearing Corp. v. SEC, Nos. 77-1199, 77-1547 (D.C.Cir. Jan. 10, 1978).
 
 
 35
 During the spring of this year after the briefing of these cases the SEC held a series of hearings and received public comments exploring the reasons for NSCC's delay in meeting the four conditions imposed by the Commission and thus in inaugurating Phase II of its operations. SEC Securities Exchange Release Act No. 14,648 (April 11, 1978); SEC Securities Exchange Act Release No. 14,411 (Jan. 25, 1978); See note 19 Supra. Although in announcing these hearings, the Commission clearly broached the possibility of modification of Order I in light of the actual operation thereof, it made clear that it ordered the hearings not because it has lost confidence in its registration decision, but in order to carry out the expansive oversight role that it explicitly accepted for itself when it approved registration. Order I, at 111-12. Accordingly, we denied petitioners' pre-argument motion to remand these cases or hold them in abeyance pending the outcome of the current proceedings before the Commission.[29]
 
 III
 
 36
 Petitioners' challenges in No. 77-1199 to Order I have a common theme that NSCC's clearing operation, as approved by the SEC, has anticompetitive effects that frustrate the provisions and policies of the 1975 Amendments. Petitioners argue both that the SEC misinterpreted the statute by underemphasizing the importance of enhancing and maintaining a competitive clearing environment, and that its predictions about the competitive and anticompetitive impact of registering NSCC do not have substantial support in the record and are arbitrary and capricious.
 
 A.
 
 37
 Before examining petitioners' specific arguments, a word is necessary about the narrowness of our review function. An overview of the administrative authority and action in this case reveals a broad statutory directive and informal administrative proceedings leading to predictive judgments about a variety of relevant factors, such as rapidity of development, geographically national access, and centralization of planning, as well as competition. In the interpretation of that statutory directive, the courts share an important responsibility and expertise with the agency. SEC v. Sloan, 436 U.S. 103, 98 S.Ct. 1702, 1712, 56 L.Ed.2d 148 (1978), but the latter's interpretation is worthy of significant deference insofar as it is contemporaneous with passage of the statute being interpreted, Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933), and insofar as its course of consideration envinces "specific attention" to that statute, Adamo Wrecking Co. v. United States, 434 U.S. 275, 98 S.Ct. 566, 570 n.5, 54 L.Ed.2d 538 (1978). See United States v. NASD, 422 U.S. 694, 719, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).
 
 
 38
 This deference increases and becomes less qualified when courts are reviewing the exercise of administrative discretion and especially, when, as here, the agency's decision partakes primarily of "prediction(s) based upon pure legislative judgment." Industrial Union, supra, 162 U.S.App.D.C. at 338, 499 F.2d at 474; Accord, FCC v. National Citizens Comm. for Broadcasting,436 U.S. 775, 98 S.Ct. 2096, 2122, 56 L.Ed.2d 697 (1978); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 409, 379 F.2d 453, 463 (1967). Even when faced with the perplexing combination of informal agency action and "substantial evidence" review that Congress occasionally includes in specific pieces of delegative legislation, including the 1975 Amendments, See generally Industrial Union, supra, the future-oriented "facts" involved as well as the undisciplined nature of the informal rulemaking record from whence those "facts" are derived impose obvious limitations and restrictions upon the intensity of judicial scrutiny.[30]
 
 
 39
 In delegating informal decisionmaking to an administrative agency, Congress generally expects the agency to draw heavily upon its expertise. Accordingly, in reviewing the resulting decisions while not sharing that expertise courts typically accord agency conclusions considerable respect. FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 29, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961); General Tel. Co. v. United States, 449 F.2d 846, 861 (5th Cir. 1971). This general congressional expectation is particularly manifest in the national market and national clearing provisions of the 1975 Amendments. First, the drafters of these provisions explicitly endeavored to leave the Commission substantial flexibility of choice in "bold(ly) and effective(ly)" accomplishing the herculean task of rapidly restructuring an entire industry. See Notes 3-4 & 10 Supra and accompanying texts. In addition, to the extent that they guided the Commission, it was by way of a list of relevant factors each of which generally calls for a difficult "determination( ) . . . of a judgmental or predictive nature," and none of which predominates. FCC v. National Citizens Comm., Supra, 98 S.Ct. at 2121. Hence, a wide range of conclusions will inevitably lie within the range of reasonable nonarbitrary choice.
 
 
 40
 It also bears remembering that, despite the undoubted relevance of competitive concerns to the disposition of these petitions, these are not cases brought initially in the courts under the antitrust laws, but are administrative review petitions brought under the 1975 Amendments to the 1934 Act. Thus, the tendency in antitrust adjudication to view business relationships in the black and white terms of legality or illegality, based solely on their competitive or anticompetitive impact, has no place here.[31] Stated another way, we see no reason generally to treat competitive concerns as any more important or any less subject to judicial deference to administrative choices, than any other factor that is relevant to the legality of administrative action. See, E. g., California Gas Producers Ass'n v. FPC, 421 F.2d 422, 429 (9th Cir. 1970); California v. FPC, 111 U.S.App.D.C. 226, 231-32, 296 F.2d 348, 353-54 (1961), Rev'd on other grounds, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962).
 
 B.
 
 41
 As noted, enhancing competition within the securities industry, while not an "objective" of the 1975 Amendments with respect to the establishment of a national clearing system, is a factor to be considered. Section 17A(a), 15 U.S.C. § 78q-1(a); See notes 3 & 11 Supra and accompanying texts. In addition, no clearing agency may be registered, if its rules "impose any burden on competition not necessary or appropriate in furtherance of the purposes" of the securities laws. Sections 17A(b)(3)(I), 78q-1(b)(3)(I); See note 4 Supra and accompanying text.
 
 
 42
 Petitioners argue that the statute charges the SEC with enforcing the antitrust laws or at least with avoiding any Unnecessary anticompetitive consequences. Their position thus approaches that taken by the Justice Department in the proceedings below that the Commission must achieve its objectives in the least anticompetitive manner possible. The statute, however, does not support such an interpretation. At most, it only requires the Commission to decide that any anticompetitive effects of its actions are "necessary Or appropriate " to the achievement of its objectives. In fact, Congress responding to importunities by the Justice Department explicitly refused to include a "least anticompetitive" requirement in the 1975 legislation.[32] Competition was simply not to "become paramount to the great purposes of the (1934) Act. . . ." S.Rep., Supra note 1, at 14.
 
 
 43
 Instead, to the extent that the legislative history provides any guidance to the Commission in taking competitive concerns into consideration in its deliberations on the national clearing system,[33] it merely requires the SEC to "balance" those concerns against all others that are relevant under the statute. Accordingly, only if some action's anticompetitive impact outweighs in importance the product of the 1975 Amendments' other objectives and the likelihood that the action will achieve those objectives, is the Commission prohibited from taking that action.[34]
 
 
 44
 Accordingly, an independent review of the statute and legislative history bears out the Commission's view that it need do no more than "balance the maintenance of fair competition and a number of other equally important express purposes of the Act." Order I, at 21; Accord, id. at 53-54. There is consequently no need in this case to resort to the rule of deference that would otherwise apply to the SEC's contemporaneous and reasoned statutory interpretation. See id. at 20-21, 53-54.
 
 
 45
 Petitioners' only other interpretive challenge to Order I Stems from the Commission's alleged unwillingness to consider "regulatory costs," See S.Rep., Supra note 1, at 14, as one of the factors relevant to its decisions. Were their characterization correct, petitioners would have a valid claim, for high enforcement costs mean reduced effectiveness in achieving the statute's other objectives and thus could result in the anticompetitive harms outweighing the benefits. Nonetheless, it is apparent to us that the Commission, not only in Order I itself, but also in the public notices preceding it, clearly acknowledged the relevance to its registration decision of the cost to it of overseeing NSCC's actions in the future. See Order I, 111-15; Release No. 12,489, Supra note 5, at 16. In large part, it accounted for those costs by making NSCC's registration contingent on its avoiding delay or other untoward activities that could increase enforcement costs and by repeatedly warning NSCC that such activities could result in modification or even revocation of its registration. See note 29 Supra.
 
 C.
 
 46
 We are consequently left with the question of whether, having properly identified the relevant statutory considerations, the Commission appropriately assessed their importance herein and balanced the results, and whether, in particular, the purely factual premises for its conclusions are supported in the record, and its legislative and predictive premises as well as the conclusions ultimately drawn are reasonable.
 
 
 47
 Petitioners make two basic claims to the effect that the SEC's decision lacks factual support and is irrational. First, they claim that the anticompetitive impact of NSCC's operation outweighs the beneficial effects thereof, and accordingly that registration should have been denied in favor of SEC efforts to put into operation an alternative approach proposed by petitioners and endorsed by the Justice Department. Second, they claim that even if conditional registration might be appropriate, the Commission at least should weed out two particularly anticompetitive aspects of NSCC's plan: "geographic price mutualization," and the awarding of NSCC's facilities management contract to SIAC without competitive bidding. See notes 18 & 22 Supra and accompanying text.
 
 1.
 
 48
 The Commission approved NSCC's registration with the recognition that doing so would largely determine the shape of the national clearing system. See note 5 Supra. It assumed, however and petitioners apparently do not disagree that, at the time, only two established plans existed that would allow such a system to be initiated with anything approaching the degree of dispatch desired by Congress. Order I, at 66, 110. The first plan, of course, is NSCC's while the second, referred to as Model II, was developed by petitioners.
 
 
 49
 Model II contemplated that NASD's clearing agency NCC (operated under contract by petitioner BNCC) would remain independent of the other, merged New York clearing agencies (SCC and ASECC), and that, bolstered by its regional branch offices, it would attempt to compete therewith. Under this approach, petitioners argued, two national clearing agencies would exist, and would compete with each other (and with the regional clearing agencies) for clearing business both within and without New York.
 
 
 50
 Although based on their former volumes of trade, NCC would be likely to begin competing with a much smaller market share (12%) than the SCC-ASECC group (73%), See note 13 Supra, petitioners nonetheless contend that, under Model II, NCC would confront the other New York clearing operation with a geographically and quantitatively closer competitor than would any of the regional agencies that are NSCC's chief competition under its plan. The result, it is argued, would be a greater likelihood that competition would have the congressionally desired effect of keeping clearing prices down, and, in turn, would relieve the SEC of much of the regulatory burden of assuring that a giant and peerless clearing agency such as NSCC does not attain and exploit a monopoly position. Put in the statutory terms developed earlier, petitioners claim that Model II would not only reduce the anticompetitive effects below those characteristic of NSCC's plan, but would increase the effectiveness of the Commission and industry efforts to achieve the other goals of the Act because it would reduce regulatory costs.
 
 
 51
 Whether or not petitioners' analysis of the comparative costs and benefits of NSCC's plan and Model II is correct,[35] however, it cannot by itself convince us to overturn Order I. That is to say, even if the SEC could have struck a Better balance in favor of achieving the Act's goals and against anticompetitive impacts, its decision passes statutory muster so long as the former achievements by whatever margin outweigh the latter impacts. Stated differently, our task is not to decide whether the Commission made the "right" (or least anticompetitive) decision or the one that this court might have made were it charged with doing so but rather whether the Commission's decision falls within the boundaries of its broad authority. We think that, in its basic outlines, Order I meets this test.[36]
 
 
 52
 On the benefits side of the scale, the SEC made several predictions about NSCC operations. As undisputed matters, the Commission noted that those operations seem capable of providing "a first . . . important step" toward achievement of a national clearing system itself a "prior or at least contemporaneous" prerequisite to the "early achievement of a national market system." Order I, supra, at 60, 55. The past experience of the three merging clearing agencies and their more recently developed "proficiency" in molding communications and data processing equipment to the needs of the industry assured that the new entity would provide "prompt and accurate clearance and settlement of securities transactions" at current and expanding trade volumes. Id. at 60, 62, 63. Particularly ASECC and SCC, with their already operative continuous netting system, could provide the backbone of a national clearing system. Id. at 61.
 
 
 53
 In addition to technical proficiency and one-step (I. e., efficient) processing, the Commission cited several other benefits of NSCC registration that we find adequately supported. The Commission, for example, pointed to cost savings incident to the combination of the three New York clearing agencies into one and the consequent "discontinuation of unnecessary operations." Id. at 65. Although the SEC is unconvinced at this stage that the clearing business nationally "is a natural monopoly," Id. at 109 & n.198, its data indicate that higher trade volumes, as will occur from consolidation of the formerly separate clearing operations, will reduce costs perhaps by as much as $17.4 million annually.[37]
 
 
 54
 Another crucial reason for the SEC's registration decision was NSCC's technological and financial "capacity to make . . . substantial contributions to the establishment of a national system. . . ." Id. at 68. Especially by utilizing and expanding NCC's system of branch offices and SCC-ASECC's Regional Interface Operation, See notes 21 & 26 Supra, the Commission felt that NSCC could quickly establish a stable framework for a national clearing system. Id. at 68-71, 73-74. Most important, the NSC plan would allow brokers formerly forced to deal with several clearing agencies to deal with one, and to have only one daily settling position in each NYSE, AMEX, or OTC security, and one daily money settlement. Moreover, in response to petitioners' warning that NSCC might have important incentives Not to take advantage of its capacity to foster a national clearing system or at least not to do so in cooperation with the regional clearing agencies and their participants the Commission adopted Conditions 1 and 2. These requirements are designed to make full and free clearing interfaces with other agencies, and the national availability of NSCC comparison facilities (either through its own regional offices or through arrangements with other clearing agencies), prerequisites to NSCC's entering Phase II.
 
 
 55
 As a final important benefit of the NSCC plan, the Commission noted that it would significantly improve competition between brokers and dealers, particularly between those located inside and outside of New York. Id. at 76-79. This improvement primarily would follow from the "expansion and upgrading of the existing NCC branch network" and also from the interface and comparison requirements in Condition 1 and 2 all of which would enhance the range and quality (and reduce the cost[38]) of services that brokers outside of New York could offer their customers. Id. at 76-77. The SEC placed considerable emphasis on this benefit, both because of the acute congressional interest in aiding regional brokers and their customers, See S.Rep., Supra note 1, at 7; H.Rep., Supra, at 90, and because broker-dealer competition has much greater impact on the overall level and cost of securities services available to the public than does competition between clearing agencies. Order I, at 78.
 
 
 56
 Ranged against these benefits is the admitted monopolistic potential of NSCC's merger of the three New York clearing agencies. Simply by its likely attractiveness, at least initially, to the former participants in SCC, ASECC, and NCC (representing about 85% Of the market), NSCC will begin operating its integrated services with a huge market share. Moreover, its continued ability to perform comparison on all NYSE and AMEX traded securities, its exclusive geographical proximity to the nation's securities center, its control of the most modern and sophisticated clearing technology, and its operation of the only set of integrated regional clearing offices suggest that NSCC may well be able to hold on to its initial participants centered in New York and to secure new participants elsewhere. Not only might this economic power undermine the viability of the regional clearing agencies, but it could deny potential entrants in the market any access to a sufficiently large clientele.
 
 
 57
 The evils generated by unregulated aggregation of economic power need not be reiterated here. See, e. g., United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); United States v. First Nat'l Bank & Trust Co., 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945). But cf. note 31 Supra. As required by Congress, the SEC paid close attention to these evils and to NSCC's susceptibility thereto. Rather than downplaying these problems,[39] the Commission has taken one step and promised to take another that together, it believes, will alleviate the problems sufficiently so that they do not outweigh the benefits of registration. Order I, at 79-95.
 
 
 58
 First, the SEC imposed four conditions aimed at assuring that (1) brokers everywhere can obtain full and inexpensive clearing services, including comparison of NYSE and AMEX trades, even if they participate in a clearing agency other than NSCC (Conditions 1, 2, and 3), (2) any clearing agency that now has, or later develops, a capacity for continuous netting may, without charge, interface with NSCC (Condition 1),[40] and (3) NSCC shares its network of branch offices with any current or new competitors (Conditions 2 and 4). Order I, at 87-95.
 
 
 59
 Second, the Commission promised in the future, and particularly when NSCC declares itself ready to enter Phase II, to monitor the actual anticompetitive effects of NSCC operations to make sure that its four conditions are being effectuated and will have their desired impact, and, generally, to assure that registration has occasioned no "unnecessary or inappropriate burdens on competition." Id. at 81. If necessary, the Commission will even consider "revoking NSCC's registration," "(u)ndoing the . . . combination" already effected during Phase I, and adopting some plan similar to Model II.[41]
 
 
 60
 Thus, the Commission assumed that by taking these two steps it could keep the anticompetitive debits to a minimum, while incurring only moderate regulatory costs, and that those debits and costs would not overcome the substantial benefits of registration. On the assumption that the SEC will indeed take the second step, if necessary, See note 29 Supra, we find these two steps sufficient to justify the Commission's conclusion that the benefits of registering NSCC outweigh the anticompetitive and regulatory costs thereof.
 
 
 61
 In sum, we find as much support in the record and in logic as may be expected in a proceeding of this kind for the SEC's predictions about the future benefits and anticompetitive impacts of registering NSCC. Moreover, the Commission's weighing of those predictive assessments is not irrational. Essentially, the Commission felt that the establishment of a national clearing framework that was virtually certain to be dependable, stable, efficient and more rapidly achievable than any other alternative justified it in risking considerable amounts of its regulatory time and effort in restraining NSCC's monopolistic tendencies. See Order I, at 79-80, 83-84. In the mind of the Commission, this approach made more sense than establishing an admittedly more competitive and eventually less regulated system that for years to come would be still developing, precarious, and thus less certain to provide safe, efficient, and inexpensive services.
 
 
 62
 We also find reasonable the SEC's expectation that its vigilance can forestall any irreparable anticompetitive harms from accompanying NSCC's registration. The four conditions generally seem designed to do just that, and to the extent they are unsuccessful, the Commission has committed itself to reevaluating the situation looking toward further modifications, conditions, or even a withdrawal of registration in favor of a more competitive approach. See note 29 Supra. Having no cause at this time to doubt the Commission's willingness and ability to honor this commitment, we generally uphold the registration decision. See id.
 
 2.
 
 63
 Petitioners next contend that, even if the Commission was within its discretion in finding that the benefits of registering NSCC generally outweigh the anticompetitive impact thereof, as to two aspects of NSCC's plan it miscalculated those benefits and impacts. In both cases, petitioners argue, the SEC should have conditioned registration on NSCC's deletion of the offending aspects of its plan. We do not agree with petitioners that the Commission's asserted errors in assessing and balancing the benefits and impacts of these two parts of NSCC's plan are grievous enough on their face to invalidate registration absent imposition of the conditions requested by petitioners. Nonetheless, we do find insufficient the Commission's explanation of its conclusions in these two limited instances, and we accordingly remand both for further study and explication.
 
 
 64
 a.
 
 
 65
 The Commission originally approved NSCC's adoption of "geographic price mutualization" (GPM), See note 22 Supra and accompanying text, because it felt that that GPM would allow NSCC participants outside of New York to obtain the same services For the same price as participants in New York. Order I, at 76-77, 86. It was believed that this price equalization would allow regional brokers better to "compete" with those in New York. Although it is unclear whether GPM actually fosters competition, in the strict sense, or whether it simply subsidizes regional brokers at the expense of those in New York, it would at least seem capable of accomplishing the congressional goal of improving the status of the former brokers vis-a-vis the latter. See note 22 Supra.
 
 
 66
 Not only petitioners, but also the Justice Department and the regional clearing agencies have vigorously opposed GPM, both before and since the issuance of Order I, leading the Commission to specify the pricing mechanism as one subject of its recent hearings on NSCC's progress from Phase I to Phase II. See Release No. 14,411, Supra ; Comments of the United States Department of Justice, Supra note 36, at 27-29; note 29 Supra and accompanying text. The primary objections to GPM are, first, that it is anticompetitive because it forces New York brokers to pay more for clearing than they would if free competitive forces were allowed to force the price down to the level of cost.[42] In addition, GPM is seen by its opponents as allowing NSCC essentially to engage in predatory (I. e., unduly Low ) pricing in the branch offices so that it may underprice and eventually put out of business its regional competitors.
 
 
 67
 The Commission has responded to these arguments by noting that without GPM, NSCC's regional offices may not attract enough customers to justify their expansion. Order I, at 86. And expansion of those offices is considered crucial to the establishment of a national clearing system. The Commission further claims that by providing NSCC's regional competitors with the right "to participate in the branch network by paying a proportionate share of the branches' operating overhead," those regional agencies can "compete with NSCC in offering services to brokers . . . outside New York City." Id. at 87 (footnotes omitted) (discussing Condition 3).
 
 
 68
 This justification for GPM appears to contradict other parts of the Commission's analysis of NSCC's plan. Most importantly, the SEC represents that there is no evidence indicating that, nationally, clearing is a natural monopoly. Id. at 109 & n.198. Consequently, it believes that competition between NSCC and the regional exchanges is achievable, and worthy of its encouragement by way of Conditions 1-4. Id. at 77. In fact, the Commission relied in part on this competition in arguing that the overall anticompetitive effects of NSCC's plan were not so large as to outweigh its benefits. Yet, the rationale behind GPM appears to be that regional competition between NSCC's branches and the local exchanges will not push regional prices down enough to make them competitive with New York prices, and, therefore, that NSCC, in order to aid its participant-regional brokers and to aid itself in obtaining those brokers' participation, must be permitted to set regional prices below cost, and, presumably, to price its competitors out of the market.[43]
 
 
 69
 Nor does Condition 3 appear to ameliorate the tension between the Commission's expressed belief in regional competition, on the one hand, and its willingness, on the other, to allow NSCC to thwart that competition through below-cost pricing. A clearing agency other than NSCC that chose to join in the operation of a branch office would still have to charge its participants enough so that it could pay its "proportionate share of the branches' operating overhead." Id. at 87. By contrast, NSCC would Not have to charge its regional participants enough to cover Its share of that overhead because it can recover part of those expenses from the mutualized (I. e., artificially high) price it charges its New York participants. Consequently, GPM still appears to afford regional brokers a great incentive to affiliate with NSCC, and correspondingly appears to dim the supposedly bright prospects for NSCC's regional competitors (whether or not they participate in NSCC's branch operations).
 
 
 70
 The upshot of the foregoing analysis is that Order I has apparently relied on two benefits of NSCC registration that cannot coexist: Either NSCC's plan and the four conditions will allow and even foster regional competition among clearing agencies, Or, through GPM, it will provide local brokers who participate in NSCC with a subsidy that allows them to operate at the same levels of cost and service as New York brokers. We have accordingly resolved to remand the GPM issue to the Commission for a better explanation, if one exists, of how GPM may be utilized without thwarting regional competition. Failing that, the Commission must either condition registration on NSCC's abandonment of GPM, or at least convincingly conclude that the loss of regional competition engendered by GPM will not upset the favorable balance of benefits and anticompetitive effects that it originally calculated on the assumption that such competition would exist.[44]
 
 
 71
 b.
 
 
 72
 In its application for registration, NSCC, a subsidiary of NYSE and AMEX as well as NASD, listed SIAC, itself a subsidiary of the two national exchanges, as its facilities manager and data processor. Earlier, NSCC's parent organizations had rejected petitioner BNCC's offer to bid against SIAC for that privilege. Petitioners, with the support of the Justice Department, argued before the Commission that NSCC should be forced to put the management-processing contract up for competitive bids. See note 18 Supra and accompanying text.
 
 
 73
 The Commission chose not to force NSCC to open up the subject contract for competitive bidding a decision we do not find inherently unsupportable. The issue is remanded, however, because of the SEC's reasoning for this particular decision that, so long as SIAC's ability to assure safe, accurate, and efficient clearing services is not in doubt, NSCC's choice of that facilities manager is not of statutory concern and is a matter for the exercise of NSCC's "business judgment." Order I, at 104. Or, as the Commission framed the argument in its brief, the statute regulates clearing agencies, "not data processors." Brief of Respondent in No. 77-1199, at 60. The result of such an analysis, of course, is to shield NSCC's choice of manager-processor from the 1975 Amendments' concern for competition.
 
 
 74
 The simple answer to the Commission's argument in this respect is found several pages earlier in Order I itself:
 
 
 75
 In legal structure the clearance and settlement operations of the AMEX, NASD and NYSE are separate wholly-owned subsidiaries, ASECC, NCC and SCC; each clearing corporation is, however, Essentially a shell corporation with relatively limited assets and a small number of administrative employees. The extensive data processing and clerical operations required to accomplish clearance settlement are housed in or furnished by Other corporate entities (I. e., SIAC, which operates SCC and ASECC, and BNCC, which operates NCC).
 
 
 76
 Order I, at 40-41. Without the ability to scrutinize NSCC's choice of manager-processor in the full light of the Act's objectives and requirements, therefore, the Commission's "broad powers (to act in a) bold and effective manner to facilitate the rapid development of a nationwide system for processing securities transactions," Order I, at 18, Quoting S.Rep., Supra note 1, at 55, would amount to nothing more than the ability to regulate "shell corporation(s)" while leaving the "extensive" operations that actually "accomplish clearance" beyond its reach.
 
 
 77
 Actually, the SEC did not totally succumb to the argument that the manager-processor contract is insulated from the requirements of the statute. It conceded that it has the power to condition approval of NSCC's choice of manager-processor on proof that "the processor will . . . provide the safeguards and efficiencies required by the Act. . . . " Order I, at 105. Yet, the Commission offered no reason, and we can think of none, that explains why NSCC's manager-processor decision must further two objectives of the Act (safety and efficiency) but not a third objective (competition). It thus is not enough for the SEC to note that "(t)he Act does not compel . . . competitive bidding," and then thrice to incant "business judgment." See id. at 104-05. The Act does not in terms compel NSCC to share its offices and computer programs with competitors or to establish interfaces, nor does it explicitly withdraw such issues from the realm of "business judgment." And yet in these areas, the Commission, by way of its four conditions, has assumed that there are no barriers to its exercise of regulatory authority.
 
 
 78
 The proper test, it seems to us, is whether any exercise of "business judgment" by a clearing agency may affect the realization of the national clearing system envisioned by Congress I. e., one that is safe, efficient, And competitive. By the Commission's own admission, a facilities manager and data processor Is, in substance, the clearing agency. Consequently, if one such processor (SIAC) is offered an opportunity by a clearing agency "shell" that is not available to any other processor (whether it be BNCC or one controlled by the regional clearing agencies), the impact on competition and new entry in the industry and thus the nexus to statutory authority is manifest.
 
 
 79
 Order I does intimate that the SIAC contract serves some of the extra-competitive objectives of the Act such as rapidity of development, safety, efficiency, and encouragement of interclearing agency cooperation (especially on the part of SCC-ASECC). Order I, at 104, 105-6. We do not question the relevance of these concerns, but only note that, in addition to them, "the Commission (must) focus with particularity on the competitive implications" of this part of SIAC's application. S.Rep., Supra note 1, at 14. Accordingly, on remand the SEC should consider whether the SIAC contract has anticompetitive impacts,[45] and, if so, whether they are justifiable in terms of the overall balance of benefits and anticompetitive impacts that it otherwise has calculated in a salutary manner.
 
 IV
 
 80
 In No. 77-1547, petitioners, albeit in the guise of challenging the two rather technical rule changes initiated by NSCC and approved by the Commission in Order II, repeat many of the arguments raised in No. 77-1199. To the extent that we have dealt with those arguments above, we will not treat them here.[46]
 
 
 81
 Petitioners do make several fresh arguments that again break down into two basic contentions: first, that the Commission failed to identify the anticompetitive effects of the rule changes and to balance them against the benefits thereof,[47] and, second, that Order I enjoins the Commission from "piecemeal" approval of any rule changes by NSCC that expand its services, and instead requires the Commission to disapprove all such changes until NSCC has satisfied the four conditions.
 
 A.
 
 82
 It is perhaps true that the Commission expended no excess energy in explaining its decision in Order II. That explanation devotes only two paragraphs to petitioners' complaints about the anticompetitive impact of the rule changes. Order II, supra at 3-4. Nonetheless, in light of the references therein to Order I, which does address at length the general competitive effects and benefits of NSCC's registration, and in light of the discussion by the Commissioners and SEC staff just preceding the issuance of Order II which help to explain that order, we are satisfied that the Commission undertook the minimal steps necessary to assure that the rule changes do not impose unnecessary or inappropriate burdens on competition.
 
 
 83
 Primary attention, of course, must be focused on Order II, for it is the subject of our review. That order finds that both the Bond Rule and the Special Representative Rule are essentially designed to put Condition 1, the free interface condition, into operation. Together, the rules increase the number of securities (by adding AMEX bonds) and brokers (by adding certain brokers participating in clearing agencies interfaced with SCC through RIO, See note 26 Supra ) qualified to take part in RIO. Since NSCC plans to use RIO as the foundation for the more complete interface system contemplated by Condition 1, See note 26 Supra, which in turn is designed to ameliorate the anticompetitive impacts of NSCC's registration, the Commission concluded that the rule changes actually "allow broker-dealers a wider choice in clearance and settlement" than before, and, accordingly, Enhance competition.[48]
 
 
 84
 Given, in addition, the extensive discussion in Order I of the procompetitive effects of expanded interfaces between NSCC and its competitors, Order I, at 69-73, and given the conclusion of SEC staff members expressed to the Commission on the eve of its issuance of Order II that these beneficial effects would accompany the rule changes and would overcome any anticompetitive fallout therefrom,[49] we cannot say that the Commission did not undertake the appropriate balance of the statutory concerns before approving the changes. Accordingly, we hold that the Commission's course of approval of the changes comported with the 1975 Amendments.
 
 B.
 
 85
 As petitioners correctly point out, even if Order II is consistent with the 1975 Amendments, it may be found arbitrary and capricious if it is inconsistent with expectations created by Order I at least if the departure from those expectations is not explained in a rational fashion. International Union v. NLRB, 148 U.S.App.D.C. 305, 317, 459 F.2d 1329, 1341 (1972). In this context, Order I states that during Phase I "(e)ach division (of NSCC, I. e., SCC, ASECC, and NCC) will operate under Substantially the same rules, procedures and agreements used by the division's predecessors," at least "until each of the clearing corporations which must establish links with NSCC in order to (implement Condition 1) has, in the judgment of the Commission . . . had an adequate opportunity (to do so)." Order I, at 43, 69-70 (emphasis added). The Commission concedes that Condition 1 was not satisfied at the time it issued Order II and, in fact, has not yet been implemented. See note 19 Supra.
 
 
 86
 The question, then, is whether Order I prevents NSCC from changing Any one of its division's rules (at least insofar as those changes improve NSCC's position) until it is ready to make All of the rule changes and other arrangements necessary to implement fully the four conditions. The upshot of petitioners' affirmative answer to this question is that NSCC's move from Phase I to Phase II and its satisfaction of the four conditions must occur virtually instantaneously. The Commission for its part contends that, insofar as these rule changes Implement Condition 1, See note 48 Supra and accompanying text, they are consistent with Order I ; and thus it implicitly rejects the argument that Order I requires the move from Phase I to Phase II to be made in one comprehensive step rather than in several small ones. Order II, at 3.
 
 
 87
 We, too, are unable to detect anything in Order I that prevents NSCC from taking interim steps in the direction of implementing the four conditions, insofar as the steps are (1) consistent with the 1975 Amendments' balancing test and other requirements and (2) do not allow NSCC "substantially" to change its rules, and thus, to "cement (its) monopoly position in a way that would be inappropriate." Order I, at 43; JA at 107 (remarks of Comm'r Evans).[50] Although Order I would not be inconsistent with a one-step transition, it also appears to leave open the possibility of a multi-step approach, as limited above. See Order I, at 43 (contemplating Phase I rule changes that are not "substantial"); Id. at 81 (SEC will monitor "Each step NSCC takes toward implementing Phase II") (emphasis added). Because the rationale for using such an approach is readily "apparent," See Industrial Union, supra, 162 U.S.App.D.C. at 344, 499 F.2d at 480 I. e., to let the necessary changes occur as the result of a relatively undisruptive "evolution," rather than requiring NSCC to coordinate and implement an instantaneous "revolution" the Commission's choice in Order II between the alternatives left open in Order I is not to be disturbed.
 
 
 88
 The order at issue in No. 77-1199 is affirmed in all respects excepting its treatment of geographic price mutualization and the facilities management-data processing contract. The case is remanded for further exploration of whether these two aspects of NSCC's registration application are consistent with the 1975 Amendments' admonition that anticompetitive impacts not outweigh other regulatory benefits. The order at issue in No. 77-1547 is affirmed.
 
 
 89
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to Title 28 U.S.C. § 293(a)
 
 
 [1]
 See also Securities and Exchange Commission, Study of Unsafe and Unsound Practices of Brokers and Dealers, H.R.Doc.No.231, 92d Cong., 1st Sess. 13 (1971); Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, Securities Industry Study, H.R.Rep.No.1519, 92d Cong., 2d Sess. (1972); Subcomm. on Securities of the Senate Comm. on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess., Securities Industry Study (Comm.Print 1973); Senate Comm. on Banking, Housing and Urban Affairs, Securities Acts Amendments of 1975, S.Rep.No.75, 94th Cong., 1st Sess. 1-88 (1975), U.S.Code Cong. & Admin.News 1975, p. 179 (hereinafter referred to as S.Rep.)
 
 
 [2]
 When two brokers agree on the floor of an exchange, or over the counter (I. e., usually, over the telephone), to a buy-sell transaction for their clients, the actual transaction has only begun. Thereafter, several steps must be taken to complete the course of dealing. These steps are typically the responsibility of a clearing agency, one of which traditionally has been linked to each of the national and regional exchanges, and one of which has served the over-the-counter market
 The clearing agency has three functions. First, the agency "compares" submissions of the seller's broker with those of the buyer's to make sure that there is a common understanding of the terms of the trade. Following this process, the resulting "compared trade" is "cleared." Most simply, this amounts to the clearing agency advising the selling and buying brokers, respectively, of their delivery and payment obligations. The system becomes far more complicated although, with the help of computers, also more efficient insofar as the clearing agency attempts, for a given period of time, to net all of a broker's transactions in each security as well as all of his monetary obligations. By this means, and by making all rights and duties run between the broker on either side of the transaction and the clearing agency, rather than between the brokers themselves, each broker is reduced to making or receiving one delivery for each security traded, and one cash payment, per day. In addition to reducing transactions costs, this latter method of clearing, referred to as "continuous netting," eases the risk to each broker and his client that the other party will become insolvent or otherwise fail to complete the transaction. The final, "settlement," stage in the process involves the delivery of securities certificates to the purchasing broker and the payment of money to the selling broker. Modernization of this task has led to storage of most stock certificates in a depository affiliated with the clearing agency. Thus, "delivery" amounts to a bookkeeping entry that removes the security from one account and places it in another.
 The breakdown in these processes during the late 1960's largely antedated, and supplied the impetus for, the modern computerization and netting trends. The breakdown was occasioned by the sharp increase in securities transactions during the period, which prevented many trades from being compared, cleared, and settled within the five-business-day period traditionally allotted for the process.
 
 
 [3]
 Section 17A(a), 15 U.S.C. § 78q-1(a), provides in relevant part:
 (1) The Congress finds that
 (A) The prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors.
 (B) Inefficient procedures for clearance and settlement impose unnecessary costs on investors and persons facilitating transactions by and acting on behalf of investors.
 (C) New data processing and communications techniques create the opportunity for more efficient, effective, and safe procedures for clearance and settlement.
 (D) The linking of all clearance and settlement facilities and the development of uniform standards and procedures for clearance and settlement will reduce unnecessary costs and increase the protection of investors and persons facilitating transactions by and acting on behalf of investors.
 (2) The Commission is directed, therefore, having due regard for the public interest, the protection of investors, the safeguarding of securities and funds, and maintenance of fair competition among brokers and dealers, clearing agencies, and transfer agents, to use its authority under this chapter to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities (other than exempted securities) in accordance with the findings and to carry out the objectives set forth in paragraph (1) of this subsection. . . .
 
 
 [4]
 Section 17A(b), 15 U.S.C. § 78q-1(b), provides in relevant part:
 (1) Except as otherwise provided in this section, it shall be unlawful for any clearing agency, unless registered in accordance with this subsection, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce to perform the functions of a clearing agency with respect to any security (other than an exempted security). The Commission . . . may . . . exempt any clearing agency . . . from any provision of this section . . . .
 (2) A clearing agency may be registered under the terms and conditions hereinafter provided in this subsection and in accordance with the provisions of section (19(a), 15 U.S.C. s) 78s(a) . . . by filing with the Commission an application for registration in such form as the Commission, by rule, may prescribe containing the rules of the clearing agency and such other information and documents as the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the prompt and accurate clearance and settlement of securities transactions.
 (3) A clearing agency shall not be registered unless the Commission determines that
 (A) Such clearing agency is so organized and has the capacity to be able to facilitate the prompt and accurate clearance and settlement of securities transactions for which it is responsible, to safeguard securities and funds in its custody or control or for which it is responsible, to comply with the provisions of this chapter and the rules and regulations thereunder, to enforce . . . compliance by its participants with the rules of the clearing agency, and to carry out the purposes of this section.
 (F) The rules of the clearing agency are designed to promote the prompt and accurate clearance and settlement of securities transactions, to assure the safeguarding of securities and funds which are in the custody or control of the clearing agency or for which it is responsible, to foster cooperation and coordination with persons engaged in the clearance and settlement of securities transactions, to remove impediments to and perfect the mechanism of a national system for the prompt and accurate clearance and settlement of securities transactions, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination in the admission of participants or among participants in the use of the clearing agency, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this section or the administration of the clearing agency.
 (I) The rules of the clearing agency do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter.
 "Clearing agency" is defined in section 3(23)(A) of the Act, 15 U.S.C. § 78c(23)(A):
 The term "clearing agency" means any person who acts as an intermediary in making payments or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities. . . .
 
 
 [5]
 The 1975 Amendments do not in terms require the SEC to examine every registration application in light of the broader national goals in section 17A(a), 15 U.S.C. § 78q-1(a). Instead, they only require the application to meet the requirements for registration set forth in section 17A(b), 15 U.S.C. § 78q-1(b). As an examination of notes 3 and 4 Supra indicates, however, the specific requirements in the registration subsection do largely reflect the concerns of the preceding, national goals, subsection
 In the present case, moreover, the SEC acknowledged that its decision on the registration application was "likely to have a determinative impact on the development of a national system for clearance and settlement of transactions . . . ," and it accordingly widened its inquiry (and the scope of public comment thereon) to include consideration of the consistency of registration with its duty to establish a national clearing system as envisioned by section 17A(a). SEC Securities Exchange Act Release No. 12,489, at 8-9 (May 29, 1976). Accord, Order I, at 82 (NSCC registration gives it "pivotal" position in clearing industry); SEC Securities Exchange Act Release No. 12,954, at 7-8 (Nov. 3, 1976). Furthermore, all parties agree that this court should not uphold the Commission's actions in this case unless they are consistent with both the national-goals and registration subsections in section 17A. Accompanying the SEC's enhanced burden in this regard, however, is Congress' similarly enhanced desire to leave the SEC considerable discretion in structuring a national system.
 
 
 [6]
 Section 19(a)(1), 15 U.S.C. § 78s(a)(1) provides in relevant part:
 (1) The Commission shall, upon the filing of an application for registration as a . . . registered clearing agency, . . . publish notice of such filing and afford interested persons an opportunity to submit written data, views, and arguments concerning such application. Within ninety days of the date of publication of such notice (or within such longer period as to which the applicant consents), the Commission shall
 (A) by order grant such registration, or
 (B) institute proceedings to determine whether registration should be denied. Such proceedings shall include notice of the grounds for denial under consideration and opportunity for hearing and shall be concluded within one hundred eighty days of the date of a publication of notice of the filing of the application for registration. At the conclusion of such proceedings the Commission, by order, shall grant or deny such registration. The Commission may extend the time for conclusion of such proceedings for up to ninety days if it finds good cause for such extension and publishes its reasons for so finding or for such longer period as to which the applicant consents.
 The Commission shall grant such registration if it finds that the requirements of this chapter and the rules and regulations thereunder with respect to the applicant are satisfied. The Commission shall deny such registration if it does not make such finding.
 
 
 [7]
 5 U.S.C. § 553, Cited in S.Rep., Supra note 1, at 128-29; See id. at 56
 
 
 [8]
 Section 19(b)(1), 15 U.S.C. § 78s(b), provides in relevant part:
 (1) Each self-regulatory organization shall file with the Commission, in accordance with such rules as the Commission may prescribe, copies of any proposed rule or any proposed change in, addition to, or deletion from the rules of such self-regulatory organization (hereinafter in this subsection collectively referred to as a "proposed rule change") accompanied by a concise general statement of the basis and purpose of such proposed rule change. The Commission shall, upon the filing of any proposed rule change, publish notice thereof together with the terms of substance of the proposed rule change or a description of the subjects and issues involved. The Commission shall give interested persons an opportunity to submit written data, views, and arguments concerning such proposed rule change. No proposed rule change shall take effect unless approved by the Commission or otherwise permitted in accordance with the provisions of this subsection.
 (2) Within thirty-five days of the date of publication of notice of the filing of a proposed rule change in accordance with paragraph (1) of this subsection, or within such longer period as the Commission may designate up to ninety days of such date if it finds such longer period to be appropriate and publishes its reasons for so finding or as to which the self-regulatory organization consents, the Commission shall
 (A) by order approve such proposed rule change, or
 (B) institute proceedings to determine whether the proposed rule change should be disapproved. Such proceedings shall include notice of the grounds for disapproval under consideration and opportunity for hearing and be concluded within one hundred eighty days of the date of publication of notice of the filing of the proposed rule change. At the conclusion of such proceedings the Commission, by order, shall approve or disapprove such proposed rule change. The Commission may extend the time for conclusion of such proceedings for up to sixty days if it finds good cause for such extension and publishes its reasons for so finding or for such longer period as to which the self-regulatory organization consents.
 The Commission shall approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of this chapter and the rules and regulations thereunder applicable to such organization. The Commission shall disapprove a proposed rule change of a self-regulatory organization if it does not make such finding. . . .
 
 
 [9]
 Section 11A(a), 15 U.S.C. § 78k-1(a) provides in relevant part:
 (1) The Congress finds that
 (A) The securities markets are an important national asset which must be preserved and strengthened.
 (B) New data processing and communications techniques create the opportunity for more efficient and effective market operations.
 (C) It is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure
 (i) economically efficient execution of securities transactions;
 (ii) fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets;
 (iii) the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities;
 (iv) the practicability of brokers executing investors' orders in the best market; and
 (v) an opportunity, consistent with the provisions of clauses (i) and (iv) of this subparagraph, for investors' orders to be executed without the participation of a dealer.
 (D) The linking of all markets for qualified securities through communication and data processing facilities will foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors, facilitate the offsetting of investors' orders, and contribute to best execution of such orders.
 (2) The Commission is directed, therefore, having due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets, to use its authority under this chapter to facilitate the establishment of a national market system for securities (which may include subsystems for particular types of securities with unique trading characteristics) in accordance with the findings and to carry out the objectives set forth in paragraph (1) of this subsection. . . .
 
 
 [10]
 S.Rep., Supra note 1, at 7, 13, 54, 55, 58, 126; H.Rep., Supra, at 50-51; Conf.Rep., Supra, at 102. In fact, the Conference Committee for the most part accepted the Senate version of the 1975 Amendments because it accorded the SEC greater discretion than the House version to facilitate the establishment of the national market system. Id. at 92
 
 
 [11]
 It is true, of course, that the clearing provision also endorses the enhancement of competition. However, it does so not in listing its "objectives," but instead in listing the factors for which the Commission is to have "due regard" in achieving those objectives. Section 17A(a)(2), 15 U.S.C. § 78q-1(a)(2). See note 3 Supra. Thus, the statutory structure appears to accord competition less prominence in the clearing section, where it is merely a factor to be considered, than in the national market section, where it is an objective. But see note 33 Infra
 
 
 [12]
 As summarized by the drafters, the goal of the national market system is the "centraliz(ation of) trading of securities in the interest of both efficiency and investor protection" and the "eliminat(ion of) all unnecessary or inappropriate burdens on competition," while the goal of the national clearing system is the "centraliz(ation of) every facet of the securities handling process" and "the prompt development" of an efficient "paper-handling" process. S.Rep., Supra note 1, at 2, 55
 
 
 [13]
 The national exchanges are the New York Stock Exchange (NYSE) and the American Stock Exchange (AMEX), both of which are located in New York. Each owns its own clearing agency the Stock Clearing Corp. (SCC) and the American Stock Exchange Clearing Corp. (ASECC), respectively although a separate company, Securities Industry Automation Corp. (SIAC), which is jointly owned by NYSE and AMEX, currently acts as facilities manager and data processor for both SCC and ASECC. Together, SCC and ASECC account for about 73% Of the clearing and settling functions performed in this country
 The major regional exchanges are the Boston Stock Exchange, which owns and operates the Boston Stock Exchange Clearing Corp., the Midwest Stock Exchange, which owns and operates the Midwest Clearing Corporation, the Pacific Stock Exchange, which owns the Pacific Clearing Corp. (operated by petitioner Bradford National Clearing Corp.), and the Philadelphia Stock Exchange, which owns and operates the Stock Clearing Corp. of Philadelphia. These exchanges and their clearing associates together handle about 15% Of the securities transactions nationwide.
 The bulk of the remaining share of the securities market about 12% Stems from the OTC trade under the auspices of the NASD and its subsidiary, the National Clearing Corp. (NCC).
 The rules "tying" exchanges and subsidiary clearing agencies were designed at least in part to serve goals other than market division and preservation of customer pools. See note 21 Infra. Nonetheless, those rules also have these latter results. In addition, because most exchange-listed securities, including those on the NYSE and AMEX, may be traded on all of the regional exchanges and over the counter, these rules meant, for example, that a broker outside of New York could initiate NYSE and AMEX transactions locally, but still had to clear them through New York.
 A more complete discussion of the structure of the clearing industry at the time the 1975 Amendments were enacted and of the industry's response to those Amendments culminating in this litigation may be found in Order I, at 34-52. The summary herein is largely derived from that source.
 
 
 [14]
 Of particular note in the present context, BNCC underbid SIAC (the facilities manager/data processor owned jointly by NYSE and AMEX, See note 13 Supra ) for the facilities management contract with NASD's clearing agency, NCC
 
 
 [15]
 Although its primary office was located in Manhattan, at the time of the negotiations NCC also operated a series of regional branch offices through which its customers outside of New York had access to its clearing facilities. Thus, when NCC merged with the other two New York clearing agencies it gave the new entity a capacity for dealing locally with brokers and dealers located outside of Manhattan
 
 
 [16]
 As eventually agreed to, users comprised 12 of the 16 members of the board of directors, with the other four seats taken by one representative each of NYSE, AMEX, and NASD, and one by the president of the entity. Nonetheless, the three parent organizations have a qualified veto power with respect to all rules of the entity save those imposed by law
 
 
 [17]
 In its final form, the merger agreement provided essentially that each of the three New York clearing agencies would receive one-third of the new entity's 30,000 outstanding shares of common stock in return for the transfer of their operating assets. In addition, the three parent organizations, NYSE, AMEX, and NASD, were to receive $.12 for each buy and sell of trades in equity securities executed on their respective markets. Total annual payments, however, were not to exceed $3 million to NYSE, $1 million to AMEX, and $550,000 to NASD
 
 
 [18]
 Under the merger plan finally settled upon, SIAC was given a five-year management contract, albeit one that could be terminated by the clearing entity at any time after two years upon payment of a specified termination fee. SIAC agreed not to charge the clearing entity more than cost for its services. That NYSE and AMEX own SIAC, are part owners of the clearing entity, and control two of the sixteen members of the board of directors of that entity, See note 15 Supra, suggest that SIAC has significant leverage in retaining its contract
 
 
 [19]
 Although NSCC's application was approved in early 1977, it had not completed Phase I by the time of oral argument in this case, some 16 months later. The SEC is currently investigating the delay. See note 29 Infra and accompanying text
 
 
 [20]
 Under the NSCC merger plan, NCC was to exercise a termination option in its contract with BNCC so that SIAC could take over as facilities manager
 
 
 [21]
 At this stage of technological development, comparison presents the greatest obstacle to the establishment of a simple and efficient national clearing system. Because comparison "interfaces" between clearing facilities are not yet feasible, it is impossible for the two brokers involved in a transaction to submit their trade data to different clearing facilities and to receive an immediate comparison. The rules linking exchanges to subsidiary clearing facilities alleviated this problem by providing a common facility at which the two parties to a transaction could compare their trade without agreeing in each instance on a mutually satisfactory comparison agency. NSCC's proposal also had to face this problem, and it did so by restricting its comparison services primarily to NYSE, AMEX, and OTC traders in New York, who are in a position to submit their data directly to NSCC's facility located in the City
 Recently, however, NCC has developed a system of regional branch office comparison, whereby comparison data for OTC trades may be submitted to different facilities around the country and then transferred to a common locus for comparison. NSCC proposed to continue this service so that OTC traders outside of New York could compare their trades through the regional branch or branches nearest them. Furthermore, it proposed in the future to extend the service so that NYSE and AMEX traders could do the same.
 NCC's regional system also establishes the feasibility of linking All clearing agencies electronically, so that brokers can submit data to the clearing agency of their choice from whence the data can be transferred to a common site and compared. Moreover, the industry has also experimented with interfaces by which trades compared by one clearing agency may be transferred to another for clearing and settlement. Together, these innovations allow a broker to use only one clearing agency, wherever located, as his sole agent for comparing, clearing, and settling all trades on any exchange or market with any other broker. Nonetheless, until comparison interface technology is fully developed, that one agent may have to use another clearing agency to perform the comparison function.
 
 
 [22]
 Geographic price mutualization achieves the objective of expanding the securities market into a geographically nationalized operation, rather than one dominated by New York. This objective is served by allowing brokers outside New York to "compete" more effectively with those inside New York. Whether it also enhances competition in the stricter economic sense I. e., whether it allocates resources more efficiently is a different question. It is conceivable that concentrating the securities market in one city, albeit to the disadvantage of securities operatives located elsewhere, allocates resources most efficiently. Such a situation may well have existed prior to the advent of modern communication and data processing technology, and may even continue today. If so, geographic price mutualization is actually anticompetitive and essentially subsidizes regional brokers at the expense of those located in New York
 
 
 [23]
 Release No. 12,489, Supra note 5; SEC Securities Exchange Act Release No. 12,274 (March 29, 1976). Petitioners have expressed no doubts about the adequacy of the procedures used by the Commission in approving registration
 
 
 [24]
 The Commission defined a "full interface" as "one through which any participant in either of the interfacing clearing corporations can move all its transactions in issues eligible for comparison, clearing and settlement at both clearing corporations." Order I, at 69 n.121
 
 
 [25]
 None of the petitioners herein has the ability independently to compare, clear, and settle securities transactions by way of continuous netting a prerequisite to the right to interface with NSCC. See note 2 Supra. Hence Order I did not explicitly include any of petitioners in its list of agencies with which NSCC must interface. Nonetheless, petitioner BNCC does operate the clearing agency affiliated with the Pacific Stock Exchange, See note 13 Supra, which has the right to interface with NSCC now, and petitioner Bradford Securities Processing Services, Inc. (BSPS) currently has pending before the SEC a proposal to change its rules and fee schedule to allow it to expand its comparison of services as a step in the direction of establishing a continuous netting system. The Commission recognizes the petitioner companies as efficient and innovative competitors in those clearing areas in which they are active. See Joint Appendix in No. 77-1547, at 106, 109 (remarks of Comm'r Evans)
 In its briefs, BSPS has contended that it cannot fully develop a continuous netting capability until its client base expands. And that expansion, it further claims, has been prevented by the "tying" rules through which NYSE and AMEX have traditionally insisted that their traders use their subsidiary clearing operations. As promised, however, See SEC Securities Exchange Act Release No. 13,027 (Dec. 7, 1976), the Commission recently forced all of the exchanges and NASD to abandon the assailed "tying" rules, See, e. g., SEC Securities Exchange Act Release Nos. 14,299, 14,636 (Dec. 4, 1977 and Apr. 7, 1978), and BSPS presumably is or will soon be free to offer its services even to traders on the NYSE and AMEX, and thus to develop the capability of interfacing with NSCC, as the Commission has invited it to do. Order I, at 90 n.168; Accord, SEC Securities Exchange Act Release No. 13,584 (June 1, 1977). These events thus appear to have removed any substance to petitioners' claims that the SEC should have accorded it an interface despite its inability to offer a continuous netting service, and that the tying rules emasculate the four conditions in other ways. See Brief for Petitioners in No. 77-1199, at 41-45; note 46 Infra. Accordingly, we will not comment further on these claims. See also note 27 Infra.
 
 
 [26]
 In 1975, several members of the clearing industry, including SCC and some of the regional exchange affiliates, initiated a pilot interface program, called the Regional Interface Organization (RIO). Under this program, the clearing agency affiliated with the exchange in which a transaction is initiated compares the trade, but then routes the compared trade to any other participating clearing agency for clearing and settlement
 Nonetheless, RIO was originally an experiment and has been limited to trades in selected securities by selected brokers. In addition, although the record's description of RIO is sparse, it apparently is, at best, only available where both brokers in a transaction are participants in the clearing agency that is to clear and settle the trade. Thus, if two Chicago brokers traded an AMEX security on the Midwest Stock Exchange (MSE), as often occurs, RIO might allow them also to use MSE's clearing agency (MCC), to clear and settle the transaction after it had been compared through the ASECC division of NSCC but only if both brokers are participants of MCC. Finally, some participating clearing agencies, including SCC, have made use of RIO less desirable by imposing fees on transactions that move through interfaces. NSCC apparently plans to use RIO, which is still in operation and will continue to be operated by the SCC division of NSCC during Phase I, as the skeleton of the full interface system contemplated by Condition 1. See notes 27 & 28 and accompanying texts Infra.
 
 
 [27]
 The Commission approved this rule change and petitioners sought review thereof (and filed their briefs) Before the Commission abolished the "tying" rules linking NYSE and AMEX to the SCC and ASECC divisions of NSCC. See note 25 Supra. Hence, the immediate effects of the rule change were (a) to force all brokers trading bonds on the NYSE and AMEX to use the SCC division of NSCC as their clearing facility, and (b) to establish that division as the only one technologically capable of providing a single clearing service for debt traders on the two national exchanges
 Since the SEC has secured the repeal of the "tying" rules, however, presumably any other clearing agency may offer to clear and settle NYSE and AMEX debt securities transactions. Moreover, NSCC has also authorized NYSE and AMEX debt securities to move through the RIO interfaces that have been established since 1975. See note 26 Supra. Hence, at this point, competing clearing agencies can offer to clear and settle any transactions by their participants in such debt securities. They will not be able to offer one-step clearing as to such securities, however, until NSCC complies with the comparison-at-cost condition (Condition 2).
 
 
 [28]
 Cf. note 26 Supra. Under this program, the nonparticipant must secure the aid of a "Special Representative." The SCC division of NSCC may confer that status on any of its members or any registered clearing agency that applies to it
 By way of example, in a typical transaction in which a nonparticipant in NSCC (NP) agrees to sell securities to a participant in NSCC the following events would be likely to occur. First, a Special Representative (SR) of NP (SR being a member of SCC) submits NP's understanding of the trade to SCC for comparison. Presumably, the participant-buyer does the same, and the trade compares. As a result, SCC credits SR with a certificate-delivery obligation and a right to the receipt of a sum of money. (The participant-buyer is credited with the opposite rights and obligations). Next, SR and NP's clearing agency, say the Pacific Clearing Corp. (PCC), submit a compared trade to SCC showing PCC as the seller and SR as the buyer of the same security for the same price. This results in SCC crediting SR with a certificate-receipt right and with a money payment obligation, and PCC with the opposite. When SR's obligations and rights from its two "transactions" are netted out, it shows zero in all columns. Meanwhile, PCC has taken over SR's certificate-delivery obligation and its money-receipt right both of which will be netted with all PCC rights and obligations to SCC, and the appropriate transfers made at the end of the day. PCC will be able to fulfill the delivery obligation because it will have secured the certificate from its participant, NP, and it will have paid NP its money against the funds it will receive from SCC at the end of the day.
 
 
 [29]
 Bradford Nat'l Clearing Corp. v. SEC, Nos. 77-1199, 77-1547 (D.C.Cir. May 10, 1978). In Order I, the Commission repeatedly promised "to monitor closely the effects of the decision" granting NSCC's registration. Should that monitoring "disclose . . . the need for new or different approaches to the registration of clearing agencies," or should NSCC fail to satisfy the SEC's four conditions within a reasonable time, the Commission promised that "if necessary, (it would) substantially modify or reverse (the registration) decision," or at least "undertake appropriate action," "to facilitate the prompt establishment of a national clearing and settlement system." Order I, at 111-12. Accord, id. at 59, 70, 81, 82, 87 n.166, 90, 98. In particular, it stated that NSCC's switch from Phase I to Phase II would provide at least one appropriate opportunity for it generally "to reconsider" the determinations in Order I. Id. at 59, 61-62, 81
 The import of these statements by the Commission is that it premised its approval of the registration on its ability to reverse or modify that decision if necessary at a later date. This "tentative" and conditional approach, See Release No. 14,411 Supra, on the one hand cautions against reading any disapproval of its former order into its recent decision to hold hearings. On the other hand, this approach also means that any action the Commission takes in the future based on new information about NSCC's progress in carrying out both its proposal and the Commission's four conditions, and about the effects thereof on the achievement of a national clearing system consistent with the 1975 Amendments, will be reviewable in light of its expectations about that progress and those effects as expressed in Order I. In other words, should the expectations in Order I prove unfounded and should no other justifications for continued registration appear, the Commission's continued endorsement of the NSCC plan without modification might then appear untenable. Our duty in reviewing These orders, however, is merely to examine whether the Commission's expectations At the time they were entered were well founded, and if so, whether they support its decision at that time.
 
 
 [30]
 Industrial Union Dep't v. Hodgson, 162 U.S.App.D.C. 331, 333, 499 F.2d 467, 469, 474 (1974); See Amoco Oil Co. v. EPA, 163 U.S.App.D.C. 162, 175, 501 F.2d 722, 735 (1974), McGowan, Congress, Court, and Control of Delegated Power, 77 Colum.L.Rev. 1119, 1125-26 (1977); note 7 Supra and accompanying text
 The drafters of the 1975 Amendments, in discussing the judicial review function, and specifically the duty to subject the SEC's "factual premises" to careful inquiry, realized that "the exercise of . . . quasi-legislative functions . . . may be based upon policy considerations and administrative expertise which cannot be reduced to specific evidentiary facts." S.Rep., Supra note 1, at 37.
 
 
 [31]
 Thus, these petitions do not raise the question of whether NSCC's actions would constitute a violation of the antitrust laws or whether those laws are implicitly repealed by the 1975 Amendments with respect to NSCC's clearing operations. See generally Gordon v. New York Stock Exch., 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975)
 
 
 [32]
 The Justice Department expressed its views to Congress in Hearings on S. 249 Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing and Urban Affairs, 94th Cong., 1st Sess. 244-52, 257-62 (1975). Apparently in response, the Senate Report, which was generally adopted by the Conference Committee, emphasized that the 1975 Amendments do "not . . . requir(e) the Commission to justify that such actions be the least anti-competitive manner of achieving a regulatory objective." S.Rep., Supra note 1, at 13
 Congress may well have refused to include as stringent a general provision forbidding anticompetitive impacts as the Justice Department desired because of its inclusion of specific restrictions against the anticompetitive practices that it found most undesirable. For example, no clearing agency may be registered if its rules allocate fees inequitably among its participants or fix rates for service provided by those participants. See sections 17A(b)(3)(D)-(E), 15 U.S.C. § 78q-1(b)(3)(D)-(E). It is worthy of note that the drafters of the House's predecessor bill to the 1975 Amendments, while expressing grave concern that the SEC's actions in this area not have anticompetitive effects and in fact that they actively promote greater competition, H.Rep., Supra, at 47, 51, did not even include in that bill a general restriction against registering clearing agencies whose rules are unnecessarily, inappropriately, or in any other manner anticompetitive. H.R. 4111, 94th Cong., 1st Sess., § 17A(d) (1975). Instead, they sought to rely entirely on specific restrictions (I. e., those eventually included in the 1975 Amendments) against particular anticompetitive practices.
 
 
 [33]
 All but one of the references in the Senate Report (on which petitioners primarily rely) to competitive concerns refer to the Commission's duties with respect to the national Market, rather than the national Clearing, system. S.Rep., Supra note 1, at 8, 11-14. Because the statutory provision on the national market system includes the enhancement of competition among its Objectives, rather than merely as a factor to be taken into account, it arguably makes competition a more important consideration than does the provision on the national clearing system. See note 11 Supra and accompanying text. Thus, we must be cautious in applying congressional statements on competition that were made in the national market context to the national clearing context
 Nonetheless, this point should not be overemphasized. The two national systems are intimately related. Moreover, the Senate Report does include approval of SEC considerations of clearing agency rules Changes, under section 19(b), 15 U.S.C. § 78s(b), See note 8 Supra, as among those cases in which competition concerns must be included in the Commission's balance of relevant considerations. And there appears to be no reason why the mandated approach to Changing clearing agency rules should differ from the analogous approach to Initiating those rules at the registration stage. Finally, the House Report makes perhaps its strongest statement regarding the importance of maintaining and enhancing competition in a passage devoted to the national Clearing system. H.Rep., Supra, at 51. But see note 32 Supra.
 
 
 [34]
 The drafters formulated the Commission's duty in this respect variously as the "explicit obligation to balance, against other regulatory criteria and considerations, the competitive implications of self-regulatory and Commission action," and the "responsibility . . . to balance the perceived anticompetitive effects of the regulatory policy or decision at issue against the purposes of the Exchange Act that would be advanced thereby and the costs of doing so," and the weighing of "the need for and effectiveness of regulatory actions in achieving th(e) purposes (of the Exchange Act) . . . against any detrimental impact on competition." S.Rep., Supra note 1, at 13-14
 Even where the legislative history and statute are not so clear as they are here, the courts have generally concluded that regulatory agencies need only include competitive concerns as one factor among many to be weighed in reaching a proper decision. E. g., Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. 142, 173 n.67, 567 F.2d 9, 40 n.67, Cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); United States v. CAB, 167 U.S.App.D.C. 313, 318-20, 511 F.2d 1315, 1320-22 (1975).
 
 
 [35]
 In fact, the Commission's choice between the two plans seems reasonable. Thus, the NSCC plan had a considerably greater capacity for rapid development, having been in the planning stage for a year prior to SEC approval, and requiring fewer interfaces than Model II. Order I, at 84-85, 107-08. Moreover, by making NCC's regional branch network, as well as SCC-ASECC's continuous netting and RIO (interface) systems available to NSCC, rather than requiring SCC-ASECC to develop the former network, and NCC the latter systems, the Commission's decision further sped up the establishment of a national clearing system and avoided costly and duplicative capital outlays. Id. at 70-71, 85, 108. The Commission also feared that, under Model II, SCC-ASECC might simply forego development of a branch system so that brokers outside of New York would have less access to comparison services for NYSE and AMEX, transactions than under NSCC's proposal. Id. at 108 & n.197
 Finally, the Commission noted two other potential disadvantages of Model II, that, while not accorded substantial weight, were of incremental import. First, NSCC's system might cost less to operate than Model II. See note 37 Infra. In addition, some commentators, including NCC itself, doubted whether it could turn a profit were it competing with SCC-ASECC without the tying rules that formerly assured it the patronage of all OTC traders. Order I, at 80, 82-83, 107.
 Thus, while conceding that Model II would "have less of an adverse impact on competition among clearing agencies in New York City than NSCC's establishment," the Commission pointed to virtually every other goal of the 1975 Amendments as significantly favoring registration of NSCC. Id. at 107. Accordingly, even if we were charged with the task of reviewing choices made by the SEC beyond its balancing benefits and anticompetitive impacts, we would find its choice of NSCC over Model II supportable.
 
 
 [36]
 This conclusion appears to be consistent with the actions of the Justice Department in these proceedings. Thus, while the Department vigorously opposed registration of NSCC before the SEC and has recently reiterated its concern in the hearings being held by the Commission, See text preceding note 29 Supra, it did not participate in this lawsuit and appears to take the position that registration is unwise as a policy matter, rather than illegal under the statute. See Comments of the United States Department of Justice (filed with the SEC, May 17, 1978)
 In reviewing the overall merits of registration, we put aside for a moment any consideration of geographic price mutualization and the lack of competitive bidding on NSCC's facilities management contract. For now, we assume that these specific aspects of NSCC's plan accomplish the goals assigned to them in Order I. In subsequent sections, we will examine whether each aspect does indeed accomplish those goals, and, if not, whether the Commission's error is grievous enough to upset the generally satisfactory balance it struck.
 
 
 [37]
 The SEC accepted NSCC's figures predicting an annual cost savings of $12.4 to $17.4 million, of which about 75% Would accrue to participants in relating to the clearing agency. The rest would appear as reductions in operating expenses of the agency itself. Order I, at 65
 Petitioners do not seriously challenge these figures. Instead, they dispute NSCC's claims that its plan will save more money than Model II. The SEC, although agreeing that NSCC "would have a lower Operating cost than Model II," by between 13 and 18%, felt that the difference was not worthy of "substantial weight" in choosing between NSCC and Model II because both plans probably would reduce participant costs equally. Id. at 67 (emphasis added).
 For purposes of reviewing the requisite balance, of course, it is sufficient that the NSCC plan would cut clearing costs substantially. We note in addition, however, that the Commission's treatment of the NSCC-Model II cost comparison reveals that it chose between the two plans with care. Thus, even if within New York a single entity operation ideally might run most cheaply (I. e., even if there is a natural monopoly situation), the Commission apparently realized that society will have to expend resources making sure that NSCC in fact charges no more than cost. It accordingly refused to credit the operating cost differential between the two plants, because Model II by confronting NSCC with price competition in New York, might have avoided enough of the regulatory costs to offset its higher operating costs.
 
 
 [38]
 The Commission premised the cost reduction that NSCC would afford brokers outside of New York mainly on NSCC's promise to equalize clearing prices for brokers inside and outside of New York. Order I, at 76-77. The viability of this pricing mechanism, "geographic price mutualization," as an enhancer of competition is discussed in note 22 Supra, and its viability under the statute is discussed Infra. The Commission also suggested that regional competition between NSCC's branch offices and the regional clearing agencies would continue and even be enhanced by NSCC's expansion of its network, and thus would contribute to lower costs. Id. at 77. The importance to broker-dealer competition of clearing costs (as opposed to greater access to the New York trading market) was minimized by the Commission, however, because clearing costs are a "relatively small component" of brokers' commissions. Id. at 78
 
 
 [39]
 The Commission did not succumb in Order I to the argument, which did appear in its brief in this court, as well as in intervenor NSCC's brief, that NSCC's plan as approved had no legally cognizable anticompetitive effects. The basis for this argument is the fact that, prior to NSCC's registration, tying rules prevented any competition. Accordingly, it is said, NSCC's provision for Some competition, however minimal, enhances competition as required by the statute. From statements in the legislative history, however, it is clear that Congress considered anything less than "full allowance for the continuance and Future entry of" competitive entities to be an anticompetitive impact with which the Commission must contend. H.Rep., Supra, at 51 (emphasis added)
 
 
 [40]
 Under the Commission's approach, it is at least theoretically possible that a competing New York clearing operation will develop in the future. Under Order I, the Commission has committed itself to encouraging any such efforts by a new entrant in the New York market, so long, of course, as such a competitor would not seriously thwart the achievement of a national clearing system
 
 
 [41]
 Order I, at 81. See note 29 Supra. In full, the SEC stated:
 (T)he Commission will monitor the impact of NSCC's registration on brokers and dealers and clearing agencies and, pursuant to the conditions to NSCC's registration contained in this order, will review each step NSCC takes toward implementing Phase II. If Phase II does not come to pass as planned, the Commission will consider revoking NSCC's registration. Undoing the limiting combination which would be effected during Phase I by NSCC's registration would not be without difficulty, and would delay briefly the realization of any potential which exists for competition between ASECC-SCC and NCC. However, the requirement that Phase II operations not be initiated until the conditions are satisfied is intended to insure that no irreversible steps are taken before the installation of mechanisms which the Commission believes will prevent Phase II operations from imposing unnecessary or inappropriate burdens on competition. And the Commission's monitoring will ensure that exploration of possible alternatives such as competition between ASECC-SCC and NCC will not be delayed unduly by an inappropriate prolongation of Phase I.
 Order I at 81.
 This passage reveals also that the Commission fully accounted in its balance for the regulatory burdens occasioned by registering NSCC. It considered those burdens worth the candle in protecting and increasing competition. We see no reason to disagree. Moreover, as the Commission suggested, any potentially viable alternative to NSCC's plan would also entail significant regulatory costs, so that undue emphasis on such costs could only mean that No national clearing system would go into operation in the near future. See Order I, at 83, 106-10.
 
 
 [42]
 This critique is perhaps more theoretical than real, however, because the New York brokers are virtually unanimous in their support of NSCC's plan, including GPM
 
 
 [43]
 To the extent that GPM did not force NSCC's regional competitors out of business, it could indicate that NSCC's branch system was operating less efficiently than its competitors and that even without GPM (assuming full interfaces were in place), regional brokers could obtain complete clearing services at low prices through the local clearing agencies. In that event, it would hardly make sense to increase prices to New York brokers to support an inefficient and unnecessary branch system. It also could indicate that clearing costs are such a small element of a brokers' overall expenses, See note 38 Supra, that variations in those costs would not necessarily induce brokers to leave their regional clearing agency and join NSCC. Were this true, however, it would make no sense for the Commission even to risk an exodus of regional brokers from local clearing agencies simply to equalize the expenses of regional and New York brokers in this, by hypothesis, insignificant area of broker costs
 
 
 [44]
 As noted earlier, the Commission has already undertaken a reexamination of GPM as part of its oversight activities. See Release No. 14,411 Supra ; note 29 Supra and accompanying text. We do not mean by our treatment of this issue to interfere with those activities. In fact, we expect that on remand the Commission will make full use of any new data it has gathered on the subject pricing mechanism
 
 
 [45]
 In its brief, the Commission argues that since NSCC would ultimately select only one manager-processor from among an array of bidders, bidding "would not necessarily increase competition. . . . " Brief for Respondents, at 59-60. This argument is unpersuasive. Regularized (E. g., triennial) bidding on public contracts is a recognized means of inducing competition in naturally monopolistic and like economic spheres where day-to-day competition is for some reason undesirable. In terms more specific to this suit, that BNCC can in one context outbid SIAC for a manager-processor contract, See note 14, holds out the possibility that the former could also manage NSCC more efficiently than or at least that it could squeeze extra increments of efficiency out of SIAC. In addition, the opportunity to bid on such a big contract at set intervals would encourage other clearing agencies to improve and expand their operations and might even spur new entry of the type that Congress credited with "the most significant (recent) advances" in the clearing industry. H.Rep., Supra, at 51
 
 
 [46]
 Most particularly, petitioners have reiterated their claim that so long as NSCC's three divisions SCC, ASECC, and NCC retain their "tying rules," NSCC's competitors are prevented from attracting the clientele necessary to establish themselves as competitors of NSCC. The rule changes, it is said, merely increase NSCC's hold on that clientele by enabling it to accustom its essentially entrapped participants to more and better services that its competitors are not now able to offer prospective customers. To the degree that these arguments turn on the evils of the now defunct tying rules and on petitioners' inability because of those rules to develop a continuous netting capacity and thus an interface with NSCC, they are without force. See notes 25 & 27 Supra ; Brief of Petitioners in No. 77-1547 at 30-31, 31-32, 33, 35, 55-56, 57-58
 We also find unpersuasive petitioners' references to recent and isolated statements of members of Congress to the effect that the SEC's approach to clearing is misguided. Aside from the fact that these statements are in part expressions of disagreement with policy choices made by the Commission, and thus are irrelevant in our limited review of the legality of the Commission's actions, we note that fragmentary statements by individual congressmen about the meaning of a statute passed two years earlier are not very likely to reflect the intent of the entire Congress at the time the statute was passed. See McGowan, Supra note 30, at 1136-37.
 
 
 [47]
 In this instance, petitioners do not claim that, assuming the Commission used the appropriate balancing test, it reached the wrong result
 
 
 [48]
 Order II, at 3; See note 27 Supra. The Commission also pointed out that the rule changes would soften the anticompetitive effects of the "tying rules" until it had completed the proceedings necessary to abrogate those rules. Order II, supra at 4
 
 
 [49]
 Petitioners concede that the two rules allow some greater participation in the nascent national system by NSCC's competitors, but they argue that the rules allow NSCC much more substantially to enlarge its services and thus to expand and solidify its client base at the expense of its competitors. During its meeting that just preceded the issuance of Order II, however, the Commission, through Commissioner Evans, expressed concern that NSCC not be allowed to "cement (its) monopoly position in a way that would be inappropriate." The staff responded that its "intent is to prevent that from happening" and that, after "carefully reviewing the comments," it had concluded that these rules changes were not "irrevocable or (otherwise inappropriate)" and in fact would enable "another clearing agency (or agencies) to compete effectively with NSCC." Joint Appendix in No. 77-1547 (JA) at 106-07. See also id. at 108-09 (remarks of Comm'rs Loomis and Evans)
 
 
 [50]
 The Commission clearly acknowledged that, prior to approving an interim (I. e., pre-Phase II) rule change, it must determine that the change does not substantially improve NSCC's position for the duration of Phase I. See JA at 106-07, 115-16 (remarks of Comm'rs Evans and Pollock). It also recognizes that it may only make such a determination after "carefully reviewing the comments," Id. at 107, of parties opposed to the changes with an eye for how the change affects NSCC's "progress towards Phase II." Id. at 118 (remarks of Comm'r Evans)